Mariano Rodriguez et al., Respondents, v City of New York, Appellant.

First Department, March 25, 1993

APPEARANCES OF COUNSEL

*Anthony M. Dillof* of counsel *(Stephen J. McGrath* with him on the brief; *O. Peter Sherwood, Corporation Counsel* of New York City, attorney), for appellant.

*Gerald E. Singleton* of counsel *(Frankfurt, Garbus, Klein & Selz, P. C.,* attorneys), for respondents.

### OPINION OF THE COURT

ASCH, J.

On March 4, 1984, plaintiff Mariano Rodriguez was an innocent passerby during a shootout between the police and one Ramon Flores. The incident began when a group pursued Mr. Flores south on Jerome Avenue, throwing bottles and garbage cans at him. A crowd was attracted by the commotion and at some point Flores drew a gun and began firing at his assailants. One of these individuals, Lazar Arioza, was wounded by Flores.

Officer Joglar testified that he was in civilian clothes, on anticrime detail, at the time of the incident. When he arrived at the intersection of Burnside and Jerome Avenues, he saw a crowd of 50 to 75 people watching something. Joglar heard shots fired. He left the car and ran toward the shots, with his radio in one hand, his shield around his neck, and his off-duty gun in the other hand, a .38-caliber revolver. Joglar saw Arioza laying in the middle of the street. He saw Flores a few feet away from Arioza, put something in his belt, possibly a gun, and start walking away. After walking just three to four feet, Flores returned to Arioza, and pulled a gun.

Upon seeing the gun, Joglar yelled "police" and transmitted

the information over his radio. Flores fired a shot at Joglar. Joglar took cover and so did Flores. The two exchanged shots until they ran out of bullets.

After Joglar had fired all his bullets, he heard shots fired from further down the street, to his right and to the southwest of his position. When the shooting stopped, Flores fled. Officers Joglar and Young chased Flores. Flores was apprehended by other officers without further incident.

Officer Young testified. At the time of the incident, Young was in a statue store working on a robbery investigation. He was in plain clothes and carried his off-duty .38 caliber revolver.

Young heard shots and exited the store and saw the crowd to his left. He took out his gun but did not display his shield. Young saw Flores walking at a rapid pace away from the crowd, going southbound on Jerome Avenue. He decided to follow Flores and walked in the same direction on the opposite (west) side of the street. Flores went almost 100 feet toward 179th Street before he turned to walk back, and Young, who had crossed the street and gotten ahead of Flores, followed him back. Flores stopped near the Post Office, brought up his gun, and started firing at Joglar. Young stated that he yelled "police" only because Joglar was an officer. Young stated that he took no action earlier to apprehend Flores because he thought Flores might have been an undercover police officer.

As soon as Young yelled "police", Flores turned and they exchanged several shots, with Young crouched behind a car.

Isabello Nieves, a postal carrier, testified to events which were consistent with Joglar's testimony. Nieves saw Flores shoot Arioza while standing in the middle of the street and immediately saw Joglar approach, with his badge around his neck, and yell "police officer, stop." Nieves said Flores never walked toward the corner of 179th Street before the police started firing. Nieves saw another plainclothes officer, but it is clear from his testimony, he was speaking of Joglar's partner, Officer Gardner.

Prior to the incident, plaintiff, Mariano Rodriguez, had been in a hardware store, on the west side of Jerome Avenue. He crossed the street to the east side. He recalled seeing a lot of people "screaming and yelling and running", but heard no shots and saw no one with a gun at any time. He ran straight across the street toward the statue store. He was shot and he felt a burning pain upon approaching the west sidewalk.

Detective Melendez who was the first person to interview Young testified that contrary to Young's version, Young told him that he was on the west side of Jerome Avenue when he first started firing. Melendez testified that Young fired "most of his shots from the west side of the sidewalk and then * * * he started to approach where [Flores] was on the opposite side of the street and * * * all he had was one shot left and he shot from just in front of the sidewalk where he was, then he ran out of bullets."

Captain Karpel was assigned to investigate the incident. He was never told that Young had followed Flores. He was told that when Young first got out on the sidewalk, he went toward the crowd and the area of the shooting. Karpel noted that his report and Detective Melendez's disagreed where Young was when he began to fire. Karpel testified that Young, Joglar and Flores were all using .38 caliber guns.

A bullet removed from Rodriguez was marked into evidence and was identified as a round-nose bullet. Karpel explained, in contrast to round-nosed bullets, semi-wad cutter bullets were flat-nosed. Karpel concluded that Officers Young and Joglar were using authorized ammunition during the incident: semi-wad cutter bullets. Three bullets were recovered from the scene of the crime. However, those bullets were destroyed by the Police Department in 1989 prior to trial.

Officer Mays, who also investigated the incident, testified that regulations of the Department require that officers use standard-issue ammunition in both their on-duty and off-duty revolvers. However, Mays also testified that there are private firing ranges where police could obtain nonstandard ammunition.

Robert DiGrazia was qualified as an expert on procedures for firearms discharge and shooting scene reconstruction. He was qualified to testify whether the actions of the officers violated departmental guidelines.

DiGrazia testified that he thought Officer Young's actions fell below accepted standards of the New York Police Department (NYPD) because he had the justification and the opportunity to stop Flores. The decision to shoot did not follow NYPD standards because the likelihood of striking Flores would be minimal compared to the danger to the other people in the area. Finally, DiGrazia stated that even if Officer Young had shot to save a life, this would be improper because the danger to the public exceeded the opportunity of apprehending Flores.

On cross-examination, DiGrazia noted that it is proper police procedure for an officer to use a firearm in the face of deadly force to save his own life or the life of another unless such action creates a danger to people in the immediate area.

Finally, DiGrazia testified that it was "absolutely" improper for the Police Department to have disposed of some of the ballistics evidence recovered at the scene, since it could have shed light on what type of bullets were fired by the police.

To counter the plaintiff's expert, the City presented Inspector Timoney. Timoney stated, in part, that "The first admonition to an officer is that you use all reasonable means before using your firearm." The second thing is you will not fire warning shots; "you cannot discharge your gun at a moving vehicle * * * unless the occupants of the moving vehicle were using deadly physical force".

Counsel for the City argued that the police could not have shot Rodriguez because they were using semi-wad cutter bullets and Rodriguez was shot with a round-nosed bullet. The City also questioned the plausibility of plaintiff's account in which Rodriguez allegedly stood in front of the Post Office for 10 minutes, did not notice the fight between Flores and Arioza, and then crossed the street to be shot by Officer Young. The City defended Officer Young's judgment in not stopping Flores immediately after seeing him.

Plaintiff questioned the credibility of Officer Young's version of events. He argued that Young did not act properly in failing to stop Flores and that this was the cause of the subsequent shootout. Plaintiff also argued that Officer Young shot at Flores and hit Rodriguez. This was reckless shooting and in violation of the guidelines.

In the precharge conference, the court denied the City's request for an instruction that the City could not be held liable for errors in judgment. The court also rejected the City's request to charge the jury on "special duty" principles of sovereign immunity.

The court instructed the jury to return a general verdict, supplemented with answers to questions concerning negligence, causation and damages. With respect to the issue of negligence, the trial court charged the jury that it might impose liability on a simple finding of negligence. Notably, the court's charge did not incorporate the parties' factual contentions with respect to the legal principles charged or set forth plaintiff's theories of liability.

At trial plaintiff advanced two scenarios which he claimed amounted to negligence: (a) that Officer Young negligently fired at Flores and hit Rodriguez in the course of the exchange of fire between the police and Flores, and (b) that Officer Young negligently failed to stop and arrest Flores before the exchange of fire between the police and Flores as a result of which Rodriguez was accidently hit.

The City argues that under the "special relationship" doctrine, a municipality may not be held liable in negligence for a police officer's failure to arrest a criminal absent the establishment of a special relationship with the plaintiff. *(See, De Long v County of Erie,* 60 NY2d 296, 304.)

■ We agree that pursuant to the special relationship doctrine, the trial court should not have permitted the jury to consider plaintiff's alternative theory of liability that Officer Young negligently failed to stop and arrest Flores before Flores shot at Joglar.

No evidence was presented at trial that could have permitted a finding that a special relationship existed between Rodriguez and the City. *(See, Cuffy v City of New York,* 69 NY2d 255, 260.)

The "special relationship" doctrine applies in situations where the City is alleged to be liable for injuries caused by a third-party nonemployee, often a criminal, based on alleged failure by the City to provide police protection or perform some other governmental function. The special relationship limitation springs from a recognition that the City has limited resources and cannot be in all places at one time; that the duty to provide police protection ordinarily is owed to the public at large and not to a specific person or class. *(See, Riss v City of New York,* 22 NY2d 579, 581-582.) Hence, it has been determined that juries will not be permitted to decide whether police protection should have been afforded to a particular individual unless certain specific requirements are met, which show that the municipality affirmatively undertook such an obligation. Absent such a showing, "the proper allocation of public resources and available police services is a matter for the executive and legislative branches to decide." *(De Long v County of Erie, supra,* at 305.)

The special duty rule is limited to cases involving nonfeasance, where the municipality is alleged to have failed to take action in breach of some general duty imposed by law or voluntarily assumed for the benefit of the public as a whole.

*(See, Cuffy v City of New York, supra).* Hence, the special relationship or special duty rule applies as to the alternative theory of liability, i.e., that Officer Young had a duty to arrest Flores earlier in time. The rule has no application to plaintiff's theory of negligence in the officer firing across the crowded street and hitting plaintiff.

■ The People also maintain that under the "judgmental error" doctrine, a municipality may not be held liable in negligence for the errors in judgment of its employees. Accordingly, they argue that Officer Young's decision not to stop and arrest Flores and his later decision to shoot at Flores were based on his best judgment and thus, under the judgmental error rule, both of plaintiff's theories of negligence are invalid.

The judgmental error rule has its roots in New York cases such as *Weiss v Fote* (7 NY2d 579). In *Weiss,* the Court considered a claim that a municipality had negligently designed an intersection, thereby resulting in injury to the plaintiff. In overturning a jury verdict for the plaintiff, the Court of Appeals noted: "In other words, it was the legislative design that, *in respect of its legal status,* the State be treated like any individual or corporation. This is far different from saying, however, that the Court of Claims Act places the State on a parity with private corporations or individuals *in respect of all its defenses."* *(Supra,* at 586-587.) It held that "[t]o accept a jury's verdict as to the reasonableness and safety of a plan of governmental services and prefer it over the judgment of the governmental body * * * would be to obstruct normal governmental operations and place in inexpert hands what the Legislature has seen fit to entrust to experts." *(Supra,* at 585-586.) Hence, the judgmental error rule, like the special duty rule, is based on principles which give recognition to the fact that the government has been entrusted to make certain judgments and determinations in planning, designing and establishing standards.

In *Weiss,* the Court specifically noted that the immunity afforded by the "judgmental error" rule only extends to quasi-judicial or discretionary planning decisions and rule-making, and not to "day-by-day operations of government" *(supra,* at 585).

Thus, in *Schuster v City of New York* (5 NY2d 75, 81-82), the Court in a review of the law noted that "[m]unicipalities have been held liable to a bystander negligently shot by a policeman engaged in an altercation with another *(Wilkes* v. *City of*

*New York,* 308 N. Y. 726); to a taxicab driver shot by a passenger negligently placed in his cab by policemen *(Lubelfeld* v. *City of New York,* 4 N Y 2d 455) * * * to the estate of a man negligently shot by a policeman for making a disturbance while intoxicated *(Flamer* v. *City of Yonkers,* 309 N. Y. 114) * * * and to a bystander injured while directing traffic at the instance of a police officer *(Adamo* v. *P.G. Motor Frgt.,* 4 A D 2d 758). In *McCrink* v. *City of New York* (296 N. Y. 99) a city was held liable for negligently having omitted to discharge a police officer by whom plaintiff's intestate was shot. In *Meistinsky* v. *City of New York* (309 N. Y. 998) the estate of a hold-up victim recovered who had been killed by an untrained officer's bullets."

However, in later cases, the Court of Appeals has clarified the applicability of the doctrine. In *Tango v Tulevech* (61 NY2d 34, 40-41), the Court wrote:

"Municipalities surrendered their common-law tort immunity for the misfeasance of their officers and employees long ago (see *Bernardine v City of New York,* 294 NY 361), but other recognized limitations still govern the tort liability of municipal officers. Relevant here is the rule that when official action involves the exercise of discretion, the officer is not liable for the injurious consequences of that action even if resulting from negligence or malice. Conversely, when the action is exclusively ministerial, the officer will be liable if it is otherwise tortious and not justifiable pursuant to statutory command *(East Riv. Gas-Light Co. v Donnelly,* 93 NY 557, 559, cited in *Rottkamp v Young, supra;* see, generally, 2 Harper and James, Torts, § 29.10). In *Rottkamp* the Appellate Division held that a building inspector who refused to issue a building permit was immune from suit because his act was discretionary (21 AD2d, at p 376). Marking the distinction between discretionary and ministerial acts, the court noted that: '[e]ach case must be decided on the circumstances involved, the nature of the duty, the degree of responsibility resting on the officer, and his position in the municipality's table of organization. It must still be true that discretion is indicated if the powers are "to be executed or withheld according to his own view of what is necessary and proper" *(Mills* v. *City of Brooklyn,* 32 N. Y. 489, 497; cf. *People* v. *Kuder,* 93 Cal. App. 42, 54-55).'

"Judicial efforts to distinguish between discretionary and ministerial acts have produced an array of decisions with results that are difficult to harmonize [citations omitted]. As

Prosser has noted, almost any act admits some discretion in the manner of performance, even driving a nail (see Prosser, Torts [4th ed], § 132, p 990). Nevertheless, the rule to be derived from the cases is that discretionary or quasi-judicial acts involve the exercise of reasoned judgment which could typically produce different acceptable results whereas a ministerial act envisions direct adherence to a governing rule or standard with a compulsory result."

In more recent cases, the rule has been applied to the actions of individual employees of municipalities operating under emergency conditions as long as the acts "involve the exercise of reasoned judgment which could typically produce different acceptable results" *(supra,* at 41). Thus in *Kenavan v City of New York* (70 NY2d 558), a cause of action for negligence against the City was held to be properly dismissed where negligent conduct was alleged on the part of one firefighter in failing to establish "fire lines" and on the part of another in failing to properly park the fire truck. The Court of Appeals held, *inter alia:*

"Consistent with the general rule that a municipality is not to be held liable for judgmental errors in the exercise of its governmental functions *(see, e.g., Weiss v Fote,* 7 NY2d 579, 584-587), ordinarily a 'fire department is not chargeable with negligence for failing to exercise perfect judgment in discharging the governmental function of fighting fires' *(Harland Enters. v Commander Oil Corp.,* 64 NY2d 708, 709; *see also, McGee v Adams Paper & Twine Co.,* 26 AD2d 186, 197, *supra; Laresca v City of New York,* 108 AD2d 790; *Kroger v City of Mount Vernon,* 104 AD2d 855; *Quinn v Nadler Bros.,* 92 AD2d 1013; *see generally,* McQuillin, 18 Municipal Corporations § 53.52, at 339 [3d rev ed]). Although a municipality may be held liable for injuries suffered by a firefighter caused by the negligence of a fellow firefighter *(see, e.g., Buckley v City of New York,* 56 NY2d 300, 305; *see also, MacClave v City of New York,* 19 NY2d 892, *affg* 24 AD2d 230; *Citowitz v City of New York,* 77 AD2d 642, *supra; Brazinski v City of Cohoes,* 17 AD2d 675, 676), liability will not be imposed where the firefighter's conduct involves the exercise of professional judgment such as electing one among many acceptable methods of carrying out tasks, or making tactical decisions that, in retrospect show poor judgment, but judgment nonetheless.

"While expert testimony established that proper fire fighting procedure called for parking the fire truck behind rather than ahead of the burning vehicle and for the erection of 'fire

lines', there was no evidence that these were immutable procedures that must invariably be followed at the scene of a vehicle fire. Indeed, every witness and every regulation left room for judgment and discretion in these matters, depending on the particular circumstances presented. That Ogno might have positioned the engine differently, or that Verdonik might have established a more effective warning to traffic are, under the circumstances of this vehicle fire, matters of judgment within the ambit of ordinary negligence for which no cause of action against a municipality will lie *(see, e.g., Kroger v City of Mount Vernon,* 104 AD2d 855, 856, *supra)." (Supra,* at 569-570.)

The Court of Appeals has restated the rule and the reasons for its application in *Mon v City of New York* (78 NY2d 309, 313):

"Whether an action of a governmental employee or official is cloaked with any governmental immunity requires an analysis of the functions and duties of the actor's particular position and whether they inherently entail the exercise of some discretion and judgment *(see, Arteaga v State of New York, supra,* at 216; *Tarter v State of New York, supra,* at 518-519). If these functions and duties are essentially clerical or routine, no immunity will attach *(see, Tango v Tulevech, supra,* at 40-42). As we stated in *Haddock v City of New York (supra):*

" '[W]hen official action involves the exercise of discretion or expert judgment in policy matters, and is not exclusively ministerial, a municipal defendant generally is not answerable in damages for the injurious consequences of that action *(see, Tango v Tulevech,* 61 NY2d 34, 40; *Arteaga v State of New York,* 72 NY2d 212, 216; *Weiss v Fote,* 7 NY2d 579). Whether absolute or qualified, this immunity reflects a value judgment that—despite injury to a member of the public—the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury.' *(Id.,* at 484.)

"If a functional analysis of the actor's position shows that it is sufficiently discretionary in nature to warrant immunity, it

must then be determined whether the conduct giving rise to the claim is related to an exercise of that discretion. Obviously, governmental immunity does not attach to every action of an official having discretionary duties but only to those involving an exercise of that discretion (see, *Haddock v City of New York*, 75 NY2d 478, 484-485, *supra*)."

Finally, in *McCormack v City of New York* (80 NY2d 808), the Court of Appeals held that the estate of a policeman killed by an emotionally disturbed individual could not recover on a negligence claim based on the commanding police officer's order at the scene not to fire at the individual even if he discharged his weapon. While the Court noted that the proof established that orders not to shoot even if fired upon are unusual, it found that liability could not be imposed because the conduct involved the exercise of professional judgment choosing one of many acceptable methods of carrying out the task or making a tactical decision, that, in retrospect, showed poor judgment (*supra*, at 811, citing *Kenavan v City of New York, supra*).

As noted, in the case before us, the plaintiff advanced two theories of negligence to the jury. One of the theories was that Officer Young's decision not to stop and apprehend Flores when he followed him to a noncongested area at the corner but to wait until Flores returned to the middle of the block where the crowd was greater, was negligent. The other was that by firing from across the street at Flores, with the crowd of people and obstructions in between, Officer Young acted negligently which was the proximate cause of the injury to plaintiff. The City urges that *both* theories must fall upon application of the judgmental error doctrine.

We find that this doctrine does, indeed, apply to the negligence of Young charged in his not apprehending Flores earlier in time. There was no evidence presented by the plaintiff, through his expert or otherwise, to show any immutable departmental procedures that must invariably be followed in *every* arrest (see, *Kenavan v City of New York, supra*, at 569). The decision whether to stop and apprehend an individual acting in a suspicious manner or to observe said individual for a period of time is a discretionary decision for the officer and cannot be held hostage to "second-guessing" after the fact. *When* to make the arrest, as presented by the circumstances herein, involved the exercise of professional judgment by the officer. His tactical decision, while it may have evidenced poor judgment in retrospect, nevertheless, entailed the exercise of

discretion or expert judgment in a policy matter and thus is cloaked with governmental immunity *(see, McCormack v City of New York, supra,* at 811; *Mon v City of New York, supra,* at 313).

However, the act of Young in firing at Flores with a crowd of people in between and hitting plaintiff does not implicate the judgmental error rule. Accepting the evidence presented by the plaintiff, Officer Young affirmatively intervened in a dangerous situation and negligently caused injury to a by-stander, by acts which deviated from clearly accepted and established protocols and procedures. "It is now clear that sovereign immunity is unavailable to the respondent [City] in respect of active negligence even in regard to or in the discharge of a governmental function. It is equally clear that it is immaterial that the respondent's duty in regard to preserving public peace is a governmental function when in the negligent discharge of that duty personal injuries result." *(Schuster v City of New York, supra,* at 87 [McNally, J., concurring].)

In contrasting the two theories of recovery, the first which falls within the judgmental error rule, involved a discretion-ary judgment made by the officer for which there are no "immutable procedures" or clearly defined standards. That is not the situation with the second theory. The evidence submit-ted by the plaintiff showed clearly defined and specific stan-dards on when officers should and should not discharge their weapons. In essence, the testimony of the expert was that the firing by the officer into a crowd was "outside the realm of acceptable police practice" *(Velez v City of New York,* 157 AD2d 370, 373, *lv denied* 76 NY2d 715) and not subject to discretion.

Since, however, the City's expert testified that in shooting at Flores, under the circumstances presented here, Young was acting in accordance with proper police procedure, "the evi-dence raised an issue of fact, bearing mostly on plaintiff's expert's credibility, as to whether the particular circum-stances presented to the policemen on the scene left room for judgment and discretion" in deciding whether to fire at Flores *(Velez v City of New York, supra,* at 374).

■■ Accordingly, the trial court erred in denying the City's request to charge that it could not be held liable for any delay in apprehending or arresting Flores, since this theory was barred by the absence of any special relationship between

plaintiff and the City and by application of the "judgmental error" rule. The trial court further erred in not giving the jury an instruction regarding the doctrine of "judgmental error" with respect to the theory that Officer Young was negligent in firing his weapon under the circumstances. Expressed differently, the court erred in allowing both theories to be submitted to the jury and in not charging "judgmental error".

■ However, we find without merit the defendant City's additional assertion, that the evidence was either insufficient as a matter of law or against the weight of the evidence, as to the shooting of plaintiff by Officer Young. In order to set aside such a verdict as being legally insufficient, we must conclude that there is "no valid line of reasoning and permissible inferences which could possibly lead rational men to the conclusion reached by the jury on the basis of the evidence presented at trial" (Cohen v Hallmark Cards, 45 NY2d 493, 499). The prior conviction of Flores for the attempted murder of Rodriguez does not impel a finding that the jury in the criminal proceeding found that Flores actually shot plaintiff. In fact, the jury also convicted Flores of attempted murder of the officers as well, although they sustained no injury. While the trial court expressed its own belief that the bullet recovered from plaintiff came from Flores' gun, the jury here was the trier of the facts, not the Judge. Further, there was no direct evidence concerning what type of bullet Young was using. Detective Mays testified that Young's gun was empty when it was first examined, and the ballistics expert testified it was impossible to determine what Young was firing from the shell casing recovered from the scene. Also, Mays testified that undercover officers and ESU officers do, in fact, use nonstandard ammunition (i.e., round-nose bullets) and such ammunition is readily available at public firing ranges. Thus, the evidence presented was sufficient to permit the jury to draw the conclusion it did based on a "valid line of reasoning and permissible inferences" (supra, at 499).

■ While we remit the matter for a new trial on liability, we must, necessarily, decide whether the award of damages was excessive under the circumstances. The jury awarded plaintiff two million dollars for pain and suffering.

Plaintiff Rodriguez was hospitalized for several months and underwent five different surgeries. Forty-one years old at the time of the incident, he suffered severe injuries to his left kidney, spleen, colon, and part of his pancreas and large

intestine. His left kidney, spleen and parts of his pancreas and colon were removed. In 1989, five years after the accident, a physical examination showed plaintiff to be well-developed and well-nourished with no acute distress. The only physical complaints he identified were abdominal discomfort and leg swelling. The loss of his left kidney is not inconsistent with his full recovery. Defendant's medical expert and plaintiff's doctor agreed that there are no consequences or effects of losing a single kidney.

Under these circumstances, and given plaintiff's successful recovery from his injuries, we find a recovery of two million dollars "deviates materially from what would be reasonable compensation" (CPLR 5501 [c]). Accordingly, a new trial both as to liability and damages is necessary.

Accordingly, the judgment of the Supreme Court, Bronx County (Luis Gonzalez, J.), entered on or about August 6, 1991, upon a jury verdict, which awarded plaintiff Mariano Rodriguez the sum of $2,015,000 and his wife, Doris Rodriguez $50,000, is reversed, on the law and facts, and the matter remanded for a new trial, without costs or disbursements.

CARRO, J. P., WALLACH and KASSAL, JJ., concur.

Judgment of the Supreme Court, Bronx County, entered on or about August 6, 1991, upon a jury verdict, which awarded plaintiff Mariano Rodriguez the sum of $2,015,000 and his wife, Doris Rodriguez $50,000, is reversed, on the law and facts, and the matter remanded for a new trial, without costs or disbursements.