[758 NYS2d 610]

CLAUDE P. LUBECKI, Plaintiff, and JOSE VARGAS et al., Respondents, v CITY OF NEW YORK et al., Appellants, et al., Defendants.

First Department, March 27, 2003

APPEARANCES OF COUNSEL

*Michael P. Eisenman* of counsel (*Miller & Eisenman, LLP*, attorneys), for respondents.

*Janet L. Zaleon* of counsel (*Kristin M. Helmers, Kenneth Sasmor, Alan G. Krams* on the brief; *Michael A. Cardozo, Corporation Counsel* of New York City, attorney), for appellants.

## OPINION OF THE COURT

TOM, J.

In this unusual case, we affirm the judgment of the trial court except insofar as the apportionment of damages under article 16 of the CPLR is concerned. We remand for a new trial solely on the issue whether there was reckless disregard by police officers for the safety of plaintiff's decedent and that of plaintiff Ramon Vargas Santiago such as would deprive the municipal defendants of the statutory apportionment provided by CPLR article 16. This tragic incident arose out of a 1993 police action when New York City Police Department (NYPD) and Transit Authority Police Department (TAPD) officers responded to the scene of a bank robbery. During the pursuit of the bank robber, a hostage was killed. That death gives rise to the issue of whether the City and the Transit Authority (prior to merger of the TAPD and the NYPD) are jointly and

severally liable along with the robber, or whether the municipal defendants are entitled to apportionment of liability pursuant to CPLR 1601.

On the morning of January 29, 1993, Police Officers Michael Moss and Edward Brown were on patrol when a bystander alerted them to an ongoing bank robbery nearby and directed them to a Chemical Bank on 91st Street and Broadway in Manhattan. As they responded, one of the robbers, Sidney Fisher, fired at them with a large semiautomatic handgun before fleeing north along Broadway with the officers in pursuit. Meanwhile, Transit Officer Ronald Bauman and Sergeant Anthony Savarese were on patrol in the vicinity when they received a radio transmission regarding the robbery, and they immediately saw the gunman running toward them. They exchanged shots, and the robber continued his flight to and along West End Avenue and then toward Riverside Drive. During this chase, numerous shots were fired by the robber as well as by police. No shots hit the robber, despite some being fired from relatively short distances. Bauman was hit in his bulletproof vest but was uninjured. As the robber passed 202 Riverside Drive, he grabbed Bonnie Vargas, who had just exited her apartment building.

By now, Police Officers Patrick White, Jose Brizuela, Silvano Brajuha, Eugene Kastner and Michael Sosa were also responding from the nearby 24th Precinct. By this time, the robber was backed against 202 Riverside Drive, which was enclosed by a fence. He was surrounded on his other three sides by police officers. The robber held Ms. Vargas in a chokehold as he waved his handgun toward the officers. Clearly, he had nowhere to go, the flight and pursuit were over, and the robber and the police were in a standoff. Capture of the gunman was prevented only by the fact of the hostage.

Bauman shouted "just look around, there's no place to go, it's over, just put down your gun." Although the robber subsequently fired in the general direction of police, they were all behind cars and other obstructions and they did not return fire at this time. No civilians, other than the hostage, were in the open or otherwise exposed to gunfire from the robber at this time.

As the standoff continued, Officer White maneuvered his way from across the street to the south side of Riverside Drive, about 10 or 15 feet from where the robber was located. Around this time, the robber started to slowly maneuver toward Riverside Drive. The robber held the hostage in front of him,

but was not pointing a gun at her head or chest. While under cover of a parked car, White positioned himself to fire at the gunman. The events that followed are less than clear in particular details, owing to different points of observation by different officers and varying degrees of recall regarding split-second occurrences, but a general narrative can be discerned. From the outset, no ranking officer gave orders.

As Officer White stood and positioned himself, the robber shot in his direction. Although White was uninjured, Officer Kastner, misapprehending what White was doing, thought that White had been hit and consequently had fallen between parked cars. White testified that he had intentionally ducked. Kastner, thinking he was returning fire when an officer was down, shot at the robber. These shots initiated a volley of gunfire by the robber and other officers who, hearing the shots, believed that a gun battle had commenced. Kastner believed that the next shot was fired by Sergeant Venezia, a ranking officer, who, rather than taking command, simply joined in the shooting. Although Kastner testified at trial that he thought that the hostage had been able to break away, this was at variance with his deposition testimony that the robber was still using the hostage as a shield when he shot at the robber. Officer Brizuela thought that the hostage either tripped or fell when the firing began, and he fired four shots as he ran toward the robber. He also testified that no one took command and no orders had been given. Officer Brajuha thought that the hostage managed to move a couple of steps away when the firing began. Brajuha conceded during cross-examination that it would violate standard police procedure for any officer to fire a weapon while a suspect held a hostage. Bauman, too, conceded that standard police procedures prohibit an officer from firing if doing so would place an innocent person in jeopardy. He initially withheld his fire because of the hostage and noted that all officers were adequately protected and that the robber never pointed his gun at the hostage or seemed to threaten her directly. However, upon hearing the shooting, Bauman also started shooting. Bauman himself fired 13 to 15 rounds. Officer Sosa also initially declined to return fire, fearing that the hostage would be struck. But when he saw Brizuela fire, Sosa changed position and began firing. Sosa admitted having had no idea where the hostage was at that time. Sosa testified that no one took command and no orders were given. Sergeant Savarese testified that he did not fire because he thought that the hostage was too close to the robber. Savarese also recalled

that at this time all police officers were adequately protected by cover. Savarese was one of the ranking officers at the scene, and though he had a radio, he failed to take command. Not being able to think of any orders to give, he gave none. Officers Brown, Moss and White could clearly see, though, that the hostage was still being held by the robber when the firing began.

A bystander, Hagit Gal-Ed, who observed the incident from an upstairs window, testified that all officers at all times were under cover, and that the hostage at all relevant times was still firmly held by the robber. She believed that more than 30 officers were present by now. She heard some officers yell at the robber to drop the gun, and some officers urging others to shoot the robber. No one seemed to be in command. By the time the shooting started, the robber, with his hostage, was positioned directly below her window. The robber fired the first shot, toward the officers. But, she testified, he had never placed the gun against the hostage's head, the hostage was firmly in his grip and positioned directly in front of him, and police then returned fire. Another bystander, Leon Marashaj, observed the pursuit and standoff from the street near the back of his UPS truck. Marashaj saw the robber, with the building at his back, surrounded by a semicircle of police and saw that at all times he held the hostage in a chokehold in front of him. When the robber fired twice toward police, they immediately returned fire.

The hostage's brother, plaintiff Ramon Santiago, also lived at 202 Riverside Drive, where he worked as a handyman. His father, with whom the hostage lived, was the building's superintendent. As he let his sister out of the service entrance that day, the robber grabbed her and Santiago heard police telling the robber to let her go. When Santiago also pleaded with the robber to let her go, the robber told him to go inside and not to worry about it, that everything would be alright. Santiago then thought that letting the police handle the matter was the best course. When he went around another entrance, he saw that the robber, with his sister, had maneuvered about 10 feet further toward Riverside Drive. He thought that about 20 or 25 officers were present. Police were shouting that the robber should drop the gun or that they would kill him. He testified that the robber shot once, without return fire, but then fired again, after which many officers returned fire.

After the shooting stopped, Santiago went to his sister and spoke to her. She turned her head and tried to speak, began

rolling her eyes and moving her fingers. He observed her leg was "split in half" and blood was coming from her groin and chest. The paramedics gave her a couple of electric shocks and took her by ambulance to the hospital. Santiago went to the hospital by taxi and waited for about an hour before a doctor told him that Ms. Vargas "just died."

The medical examiner testified that Ms. Vargas suffered three gunshot wounds to her body. One bullet penetrated her left thigh and traveled for about five inches before exiting on the other side of her thigh, a second bullet entered her right ankle, shattering her tibia and her fibula, and the third bullet entered her chest, pierced her heart and lodged in her back. It was determined that Officer Bauman's bullet struck Ms. Vargas in the leg and left foot. The parties stipulated that the third and fatal shot which struck Ms. Vargas in the heart was fired by an NYPD officer's .38 caliber gun, but it could not be ascertained which officer's gun fired that bullet.

The testimony of bystanders, though inconsistent with some police testimony, is not fatally inconsistent with all police testimony and does not necessarily detract from police credibility in toto, considering the different vantage points and different impressions of what was occurring during a fast-breaking and tense event. To the contrary, it provides some clarity. It also supports the reasonable conclusion that can be drawn from the collective testimony of the officers themselves that there was confusion as to who started firing and why, but that police return fire occurred under circumstances where the hostage was not safely removed from imminent deadly danger, and that no one else had been in imminent danger so as to justify fire by the police.

Plaintiffs commenced an action against defendants for the wrongful death of decedent Bonnie Vargas as a result of the conduct of the police officers. A claim for emotional distress was also interposed by Ramon Santiago, as a result of being in the zone of danger and witnessing the death of his sister.

Relevant portions of the Patrol Guide, section 104-1 addressing the use of deadly physical force, and section 117-12 addressing procedures to be employed when a hostage is taken or a suspect is barricaded, were admitted into evidence by plaintiffs. An Interim Order supplementing section 104-1 also was introduced. Both provisions direct that a police officer may not discharge a weapon when doing so will unnecessarily endanger innocent persons. For a hostage situation, officers on the scene must contact a hostage negotiator, Emergency Ser-

vices must be contacted and firearms control must be established and maintained.

Plaintiffs' expert was Henry Branche, a 23-year NYPD veteran. His additional bona fides were well established. He testified that any officer who fired his weapon under circumstances that would endanger innocent life violated the protocols and procedures set forth in the NYPD Patrol Guide. Branche also testified that further violations occurred when the officers at the scene failed to summon a hostage negotiator from the Emergency Services Unit, and when a ranking officer at the scene failed to take command and establish control over the use of firearms under these circumstances. More specifically, he testified that White violated procedure when he maneuvered himself into position, and stood up exposing himself, in order to try to get a shot at the robber while the robber held the hostage, under circumstances where the hostage's life was thereby imminently threatened; that Brizuela violated procedures by firing four shots as he ran in the direction of the robber and the hostage; that Sosa violated procedures by shooting at the robber without knowing the location of the hostage; that Kastner violated procedures by shooting at the robber notwithstanding the robber's use of the hostage as a shield; that Bauman violated procedures by not only shooting at the robber under these circumstances, but also by the sheer number of the shots he fired; and that it was an "egregious" violation of procedures for a ranking officer not to have taken command and not to have established firearms control. Moreover, it was a violation for these officers not to have followed procedures specifically promulgated to address hostage situations.

Defendants' expert was Frank Boltz, a 27-year NYPD veteran who was a recognized hostage expert and who had devised the NYPD procedures for hostage situations. He testified that the scene remained unstable, and that the gunman was still seeking to flee, so that the hostage provisions of the Patrol Guide were inapplicable to this situation. However, he acknowledged that once it was apparent that a hostage had been taken, officers should have refrained from action that would endanger the hostage. More specifically, he conceded that Officer White's action contravened proper procedure insofar as a hostage was taken, and that even if the robber had fired at White, other officers should not have returned fire so long as the officers had good cover. Further, Bauman's act of firing so many shots under these circumstances also violated proper procedure.

Defendants sought an instruction allowing for apportionment of their liability under CPLR article 16. The request was denied on the basis of then-authoritative caselaw, that has since been eclipsed by the Court of Appeals' ruling in *Rangolan v County of Nassau* (96 NY2d 42 [2001]). As such, the jury did not have the opportunity to make findings relevant to the apportionment of liability issue.

The jury found defendants to have been negligent and that their negligence caused the death of decedent Bonnie Vargas. Her estate was awarded $4.5 million for her conscious pain and suffering under the verdict. Upon defendants' motion to set aside the verdict, the trial court reduced this award to $3 million. Plaintiff Santiago was awarded $969,001 for emotional distress. Defendants appeal.

Defendants seek reversal on the basis of various evidentiary matters, and also on the basis that they were denied an opportunity to seek limitation of their liability by apportionment of fault and the consequential mitigation of their equitable share of damages. As for the evidentiary matters, defendants challenge, inter alia, the weight and sufficiency of the evidence; argue that police were justified in using deadly physical force by virtue of their professional judgment and that, in any event, recklessness is the proper standard under the factual circumstances of this case. Defendants also argue that police guidelines were improperly utilized as a basis for finding that a duty of care was violated; that the court erred in charging negligence as the appropriate standard of care; that the NYPD Patrol Guide and Interim Order regarding the use of deadly physical force and how to address hostage situations were improperly admitted into evidence and were improperly emphasized on the verdict sheet; and the issue on which we presently focus, that appropriate instructions regarding apportionment were not provided.

Defendants contend that they were entitled to judgment as a matter of law because, pursuant to Penal Law § 35.30 (1) (c), the officers were entitled to use deadly physical force in an attempt to arrest the gunman. However, defendants in this civil action may not claim the defense of justification applicable only as a defense to criminal charges especially insofar as they are not defending against criminal charges (*McCummings v New York City Tr. Auth.*, 81 NY2d 923 [1993], *cert denied* 510 US 991 [1993]). It must be recognized that this is a common-law negligence case sounding in wrongful death and personal injury claims predicated on the theory that responding police

officers, in utilizing deadly physical force, did not exercise the degree of care which would reasonably be required of police officers under similar circumstances (*see McCummings v New York City Tr. Auth.*, 81 NY2d 923, 925). Typically, such a case presents sharp factual disputes not amenable to summary dismissal and the jury must determine the issue of liability (*id.* at 926). On the evidence presented, the court properly denied defendants' preverdict motions to dismiss. As a common-law negligence case, standards and theories applicable to criminal prosecutions for the use of deadly physical force or for statutory claims are not applicable under the circumstances of this case (*McCummings v New York City Tr. Auth., supra* at 927, distinguishing *Tennessee v Garner*, 471 US 1 [1985]). Penal Law § 35.30 (1) (c) has no application to this negligence action.

Nor is this a proper case for the application of the professional judgment rule. A government entity acting with discretionary or reasoned judgment is immune from negligence lawsuits (*Tango v Tulevech*, 61 NY2d 34 [1983]). Defendants contend that they are entitled to dismissal because the professional judgment rule applies to immunize the conduct of the police officers. The professional judgment rule or "judgment error" rule is based on principles which give recognition to the fact that the government has been entrusted to make certain judgments and determinations in planning, designing and establishing standards (*Rodriguez v City of New York*, 189 AD2d 166 [1993]). A municipality is not held to a standard of perfect judgment, but only reasoned judgment. The professional judgment rule would insulate the municipal employer from liability for a decision "where the * * * conduct involves the exercise of professional judgment such as electing one among many acceptable methods of carrying out tasks, or making tactical decisions that, in retrospect show poor judgment" (*Kenavan v City of New York*, 70 NY2d 558, 569 [1987]). Hence, when a commanding officer gave a discretionary order not to shoot at an armed mentally disturbed person barricaded inside a house, under circumstances where a negotiator was present, and that person then fatally shot a police officer, the unfortunate consequence of the commander's order did not invalidate the order as an acceptable tactical decision among others when it was given, so that the municipal employer was not responsible for the police officer's death (*McCormack v City of New York*, 80 NY2d 808 [1992]; *accord Flynn v City of New York*, 258 AD2d 129 [1999]).

However, the immunity afforded a municipality for its employee's discretionary conduct does not extend to situations

where the employee, a police officer, violates acceptable police practice (*Rodriguez, supra* at 178; *see Velez v City of New York*, 157 AD2d 370, 373 [1990], *lv denied* 76 NY2d 715 [1990]). Hence, the judgment error rule is not triggered by the action of a police officer who injures an innocent bystander in an altercation involving a violation of established police guidelines governing the use of deadly physical force by police officers (*see e.g. Summerville v City of New York*, 257 AD2d 566, 567 [1999], *lv denied* 94 NY2d 755 [1999]) as is evidenced in the above factual narrative.

Turning to the rules and guidelines set forth in the Police Department Patrol Guide and the Interim Order, defendants contend that these materials, which are neither statutes nor ordinances, may not be used as a basis for imposing liability against the municipality. If this case involved the application of the "firefighter's rule," or the statutory vehicle for relief from that common-law rule provided by General Municipal Law § 205-e, defendants might have a point (*see e.g. Galapo v City of New York*, 95 NY2d 568 [2000]; *Flynn v City of New York*, 258 AD2d 129 [1999]). However, it does not. Plaintiffs here are not injured police officers or other uniformed service municipal employees seeking to recover for their own injuries pursuant to section 205-e. Rather, they are private citizens injured by police officers' conduct. The policy directives that disallow the use of the Patrol Guide to prove municipal negligence in cases involving the application of General Municipal Law § 205-e (*see Galapo, supra* at 576) do not operate when the issue is the standard of care to be employed by police officers using deadly physical force against others during which an innocent bystander is injured or killed. Moreover, these departmental manuals do not impose a higher duty of care than that appropriate for common-law negligence and hence, in a case such as this, do not pose the risk that internal departmental memoranda will be improperly substituted for traditional common-law standards establishing the relevant duty of care (*see e.g. Clarke v New York City Tr. Auth.*, 174 AD2d 268 [1992]; *Rodriguez, supra*; *Summerville, supra*). Accordingly, we reject defendants' challenge to the admissibility of these materials for purposes of evaluating whether the officers adhered to or materially deviated from prescribed protocol in dealing with hostage situations.

In this case, the Patrol Guide established when officers may discharge their weapons, and expert testimony established the impropriety of discharging a weapon, when doing so unneces-

sarily endangers an innocent bystander. Several police officers acknowledged that it was against police procedures to discharge their weapons when an innocent person was in close proximity to the suspect. Here, decedent was held as a human shield in the line of fire. Moreover, the testimony showed that police procedures applicable to hostage situations were not followed. It was undisputed that a hostage negotiator was never called, Emergency Services was never called, no ranking officer took control although two sergeants were present, and no commands in furtherance of firearms control were given. Thus, the evidence established that the police violated clearly established protocols and procedures, rendering the professional judgment rule inapplicable to immunize their affirmative acts of negligence (*Rodriguez v City of New York, supra*).

■ Defendants maintain that the court erred in failing to instruct the jury that liability for a violation of the police guidelines must be based on a "recklessness" standard. They argue that the public policy underlying Vehicle and Traffic Law § 1104 (e) which permits civil liability only upon finding that the driver of an emergency vehicle drove with "reckless disregard for the safety of others" (*see Saarinen v Kerr*, 84 NY2d 494, 501-502 [1994]; *O'Connor v City of New York*, 280 AD2d 309 [2001], *lv denied* 96 NY2d 716 [2001]) is equally applicable to the exigent circumstances of a police shooting during a hostage situation. Defendants' argument is unpersuasive.

While both situations may present emergencies, Vehicle and Traffic Law § 1104 specifically permits conduct that would otherwise be actionable, allowing the driver of an "authorized emergency vehicle" to exceed the speed limit and disregard other traffic regulations. It is this privilege that is circumscribed by the recklessness standard (*see Saarinen, supra* at 499-500). By contrast, the police guidelines concerning the discharge of a firearm during hostage situations require officers to exercise restraint even in the face of an emergency. The actions of the officers should therefore be judged by the ordinary standards of reasonable care with respect to the police guidelines.

■ The issue of recklessness raises the further question of whether apportionment is required under CPLR article 16, insofar as reckless conduct forms the basis of an article 16 exemption disallowing apportionment. Defendants argue that they were entitled to an instruction on apportionment under CPLR article 16. CPLR article 16 was enacted to limit the liability of certain defendants to their equitable share of fault in

carefully defined circumstances. Section 1601 (1) states that: "Notwithstanding any other provision of law, when a verdict * * * is determined in favor of a claimant in an action involving two or more tortfeasors jointly liable or in a claim against the state and the liability of a defendant is found to be fifty percent or less of the total liability assigned to all persons liable, the liability of such defendant to the claimant for noneconomic loss shall not exceed that defendant's equitable share determined in accordance with the relative culpability of each person causing or contributing to the total liability for noneconomic loss * * * ." Hence, under CPLR 1601, defendants would mitigate common-law joint and several liability if they can demonstrate that they are responsible for only 50% or less of the total liability; in that event, such a defendant's responsibility for noneconomic loss would not exceed its equitable share (see Morales v County of Nassau, 94 NY2d 218, 223 [1999]). Section 1602, though, specifically creates exceptions under various enumerated situations. The exception that is presently germane is that the general limitation on liability set forth in section 1601 shall "not apply to any person held liable for causing claimant's injury by having acted with reckless disregard for the safety of others" (CPLR 1602 [7]). In the present case, the court entertained, but rejected, defendants' request for an instruction of apportionment of liability between defendants and nonparty tortfeasors pursuant to section 1601.

The apportionment issue is complicated by the timing of the decision of the IAS court and the subsequent ruling by the Court of Appeals in Rangolan v County of Nassau (supra). Plaintiffs concede that the trial court's decision, though purportedly correct at the time, is inconsistent with Rangolan. Insofar as that instruction was not provided, the jury had not had an opportunity to make findings on any article 16 exemption. The court's reasoning was predicated on then-existing law under section 1602 (2) (iv), which provides that the statute may not be construed to modify any liability imposed by reason of a nondelegable duty or as a result of the doctrine of respondeat superior. This section, as interpreted by the trial court, barred application of section 1601 apportionment as to "any liability arising by reason of a non-delegable duty or by reason of the doctrine of respondeat superior" (see e.g. Cole v Mandell Food Stores, 93 NY2d 34 [1999]; Cortes v Riverbridge Realty Co., 227 AD2d 430 [1996]). In the present case, defendants' liability was predicated on a nondelegable duty. However, the trial court's interpretation of section 1602

(2) (iv) was rejected by the subsequent *Rangolan* ruling. *Rangolan* found section 1602 (2) (iv) to be only "a savings provision that preserves principles of vicarious liability. It ensures that a defendant is liable to the same extent as its delegate or employee, and * * * CPLR article 16 is not construed to alter this liability * * * . Similarly, CPLR 1602 (2) (iv) prevents an employer from disclaiming respondeat superior liability under article 16 by arguing that the true tortfeasor was its employee." (*Rangolan, supra* at 47.) However, *Rangolan* stated that the municipality itself may still seek apportionment between itself and other tortfeasors (*Rangolan, supra* at 47), a conclusion that fundamentally undermined the reasoning of the trial court when it declined to give the article 16 apportionment instruction. Hence, section 1602 (2) (iv) is not a bar to section 1601 apportionment, but a provision ensuring that such a defendant will remain liable. As such, the court's reason for withholding the issue of apportionment from the jury is no longer valid and defendants are now entitled to the requested instruction.

Of course, plaintiffs would then be entitled to demonstrate that an enumerated exemption barred the application of article 16 apportionment, so that defendants' request ultimately might prove futile. Plaintiffs rely on the exemption provided in section 1602 (7), insofar as the article 16 limitations do not benefit a defendant whose reckless disregard for the claimant's safety caused injury. If the police officers in this case acted in reckless disregard of the hostage's or her brother's safety, then defendants may not rely on article 16 to limit their liability. Defendants contend that they were on notice regarding only common-law negligence, and hence defended against negligence. They note that negligence does not subsume a higher standard, so that proof of negligence does not equate with proof of recklessness. As such, they argue that the present record does not allow for any particular finding on the issue of recklessness. Insofar as this exception was not pleaded, we agree with the City that there is a deficiency of notice. Section 1603 requires that the plaintiffs "allege and prove by a preponderance of the evidence that one or more of the exemptions * * * applies." Section 1603 is a notice provision, intended to alert a defendant that it may be subject to the full brunt of the judgment (*Morales v County of Nassau*, 94 NY2d 218, 223 [1999]; *see Roseboro v New York City Tr. Auth.*, 286 AD2d 222, 223 [2001], *appeal dismissed* 97 NY2d 676 [2001]). Since the jury was not charged on the theory of recklessness,

and we cannot make such a finding without offering the City an opportunity to defend against that theory, a new trial must be granted on the issue of apportionment and the applicability of CPLR 1602 (7).

For procedural reasons unique to *Morales*, amendment of the pleadings in that case was precluded. However, *Morales* would not preclude timely and appropriate amendment in the present case. We have noted elsewhere that the statute does not require that an amendment be requested at any particular time, and we have exercised liberality, especially when the defendant cannot demonstrate real prejudice and the amendment is predicated on a prima facie factual presentation (*Detrinca v De Fillippo*, 165 AD2d 505, 510 [1991]).

In view of the unusual circumstance of the present case, that an originally valid exemption (CPLR 1602 [2] [iv]) was pleaded and proved pursuant to section 1603, rendering unnecessary the inclusion of additional section 1602 exemptions, but that subsequent case law invalidated the original ruling, and that the evidence as adduced does not render plaintiffs' theory of reckless disregard meritless, plaintiffs should be provided the opportunity to seek amendment of the pleadings to include section 1602 (7) (*cf. Roseboro, supra*). Accordingly, we grant that motion and deem the pleadings amended to allege that the police officers' reckless disregard of the decedent's safety as well as that of plaintiff Ramon Vargas Santiago bars defendants' reliance on the limitations set forth in section 1601.

Finally, we find no basis to disturb the judgment as to damages. The award of $3 million damages to the decedent does not deviate materially from reasonable compensation considering the preimpact terror experienced and the significant injuries sustained before her death. Santiago's testimony, supported by medical and other evidence, amply supported his claim of emotional distress.

BUCKLEY, P.J., ELLERIN, WALLACH and GONZALEZ, JJ., concur.

Accordingly, the judgment of Supreme Court, New York County, entered January 19, 2001, which awarded plaintiff estate the principal sum of $3 million for decedent's pain and suffering and a stipulated amount for pecuniary loss, and awarded plaintiff Santiago $969,001 for emotional distress, should be modified, on the law, to remand for further proceedings on the issue whether defendants may avail themselves of the apportionment provisions of CPLR article 16, and to deem the complaint to have pleaded the standard of reckless disre-

gard by police officers in this case, as required by and defined in CPLR 1602 (7), to which defendants will also be allowed to responsively plead, and otherwise affirmed, without costs.