Stevens & Thompson Paper Co. Inc. v Middle Falls Fire Dept., Inc. (2020 NY Slip Op 06996)





Stevens & Thompson Paper Co. Inc. v Middle Falls Fire Dept., Inc.


2020 NY Slip Op 06996


Decided on November 25, 2020


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: November 25, 2020

529718

[*1]Stevens & Thompson Paper Company Inc., Appellant,
v
Middle Falls Fire Department, Inc., et al., Respondents, et al., Defendants. (And Another Related Action.)

Calendar Date: October 20, 2020

Before: Garry, P.J., Lynch, Clark, Devine and Reynolds Fitzgerald, JJ.


Whiteman Osterman & Hanna LLP, Albany (William S. Nolan of counsel), for appellant.
Taddeo & Shahan, LLP, Syracuse (Steven C. Shahan of counsel), for Middle Falls Fire Department, Inc. and another, respondents.
Morris Duffy Alonso & Faley, New York City (Iryna S. Krauchanka of counsel), for Village of Greenwich, respondent.
Burke, Scolamiero & Hurd, LLP, Albany (Steven V. DeBraccio of counsel), for Bullrushes, Ltd., respondent.



Devine, J.
Appeal from an order of the Supreme Court (Auffredou, J.), entered June 28, 2019 in Washington County, which, among other things, granted motions by defendants Middle Falls Fire Department, Inc., Village of Greenwich, Town of Greenwich and Bullrushes, Ltd. for summary judgment dismissing the amended complaint against them.
In the early morning hours of April 6, 2014, a large fire with the hallmarks of arson broke out at a vacant paper mill in the Town of Greenwich, Washington County. Plaintiff previously owned the paper mill and still owned an adjacent hydroelectric facility (hereinafter the facility) that relied upon water from an intake canal branching off from the Battenkill River. Defendant Middle Falls Fire Department, Inc. (hereinafter MFFD) responded to the fire and mutual aid was summoned from, among others, defendant Village of Greenwich. As there were no fire hydrants to supply the firefighters with water, Village firefighters stationed a fire engine near the facility to pump water from the intake canal. The pump was in continuous operation so that firefighters would have water whenever needed and, when the water was not needed, a deck gun on the engine shot the water into a ravine where it would flow back into the Battenkill River. The stream of water from the deck gun passed over the facility, however, and caused what was essentially rainfall over its powerhouse. The facility's uninterrupted power supply shut down when water seeped into the powerhouse — prompting complaints to firefighters regarding the water discharge from the deck gun — and the facility was later found to have sustained significant mechanical damage that forced it offline for a prolonged period.
Plaintiff commenced this action to recover for its damages, alleging negligence, nuisance and trespass on the part of MFFD, the Village and defendant Town of Greenwich (hereinafter collectively referred to as the fire department defendants) related to the water discharge on its property. An additional negligence claim was asserted against defendant Bullrushes, Ltd., the owner of the paper mill, for its alleged failure to address the risk of a fire being started by trespassers who were known to enter onto its property. Following joinder of issue and discovery, the Town and MFFD, the Village, and Bullrushes separately moved for, as is relevant here, summary judgment dismissing the amended complaint. Plaintiff moved for partial summary judgment on the issue of liability. Supreme Court granted those defendants' motions insofar as they sought summary judgment dismissing the amended complaint and denied plaintiff's motion.[FN1] Plaintiff appeals.
We affirm. To address the claims against the fire department defendants first, even accepting that questions of fact exist as to whether they had a special relationship with plaintiff that would give rise to a claim for negligence (see e.g. Feeney v County of Delaware, 150 AD3d 1355, 1357-1358 [2017]; Trimble v City of Albany, 144 AD3d 1484, 1485-1486 [2016]), they are nevertheless protected by the governmental immunity doctrine, which "shield[s] public entities from liability for discretionary actions [*2]taken during the performance of governmental functions" (Valdez v City of New York, 18 NY3d 69, 76 [2011]; see McLean v City of New York, 12 NY3d 194, 202 [2009]; Lauer v City of New York, 95 NY2d 95, 99 [2000]).[FN2] Under the doctrine, "[g]overnment action, if discretionary, may not be a basis for liability, while ministerial actions may be, but only if they violate a special duty owed to the plaintiff, apart from any duty to the public in general" (McLean v City of New York, 12 NY3d at 203; accord Valdez v City of New York, 18 NY3d at 76-77; see Normanskill Cr., LLC v Town of Bethlehem, 160 AD3d 1249, 1250 [2018]; DiMeo v Rotterdam Emergency Med. Servs., Inc., 110 AD3d 1423, 1424 [2013], lv denied 22 NY3d 864 [2014]). There is no question that fire protection, and obtaining the water necessary to provide it, is a purely governmental function (see Scozzafava v State of New York, 174 AD3d 1109, 1110 [2019]; Szydlowski v Town of Bethlehem, 162 AD3d 1188, 1189 [2018]; Trimble v City of Albany, 144 AD3d at 1485; Drever v State of New York, 134 AD3d 19, 21-22 [2015]). The key issue is therefore whether the fire department defendants' purportedly negligent acts — choosing to use the deck gun and aim it in a direction that caused a rain to fall around the powerhouse — were discretionary in that they arose from "the exercise of reasoned judgment which could typically produce different acceptable results" (Tango v Tulevech, 61 NY2d 34, 41 [1983]; accord Haddock v City of New York, 75 NY2d 478, 484 [1990]; see Valdez v City of New York, 18 NY3d at 79-80; cf. Trimble v City of Albany, 144 AD3d at 1487).
Bearing those principles in mind, the Village firefighters tasked with obtaining water for the paper mill fire explained that they selected the pumping site because of its ready access to the intake canal and used the deck gun to discharge unneeded water so that the pump could continuously operate and supply water to the paper mill at a moment's notice. They chose to aim the deck gun so that the stream of water would arc over the facility and land in a ravine where it would drain into the Battenkill River, a choice reflecting their training to consider the safety of themselves and the public, as well as the potential for property damage, in using the deck gun. It was further explained why the consideration of those factors led the Village firefighters to aim the deck gun as they did, as they did not know where the water would fall if aimed in some directions and saw that it would imperil their own safety or the ability to use local roads if aimed in others. Moreover, although the selected direction of the deck gun caused a rain or mist to fall upon the powerhouse when it was in use, the firefighters had no reason to anticipate that this would affect the interior of the powerhouse. A surveillance video of the area shows wet ground, but no flooding, and it appears that water that drained into an outdoor catch basin as designed then seeped into the powerhouse through a masonry joint. Further, although one could reasonably question the efficacy of the firefighters' efforts to reorient the deck gun once they learned of that problem, the efficacy of those efforts are irrelevant given that their activities caused no further seepage into the powerhouse.[FN3] Plaintiff complains that alternatives to using the deck gun were [*3]not considered and that the potential hazards of its use were overlooked, but "[a] fire department is not chargeable with negligence for failure to exercise perfect judgment in discharging the governmental function of fighting fires" (Harland Enters. v Commander Oil Corp., 64 NY2d 708, 709 [1984]; see Kenavan v City of New York, 70 NY2d 558, 569-570 [1987]; Helman v County of Warren, 114 AD2d 573, 573-574 [1985]). Even when viewed in the light most favorable to plaintiff as the nonmoving party (see Lau v Margaret E. Pescatore Parking, Inc., 30 NY3d 1025, 1027 [2017]), the foregoing demonstrates that the decisions relating to the deck gun resulted from the exercise of reasoned judgment that, as a result, rendered the fire department defendants immune from liability for ordinary negligence (see Rodriguez v City of New York, 189 AD2d 166, 175-176 [1993]; Helman v County of Warren, 114 AD2d at 573-574).
The fire department defendants were also properly granted summary judgment dismissing plaintiff's remaining claims. First, although plaintiff asserts that the fire department defendants are liable for private nuisance due to their intentional interference with the use of its property, the record is clear that the injurious water infiltration at the powerhouse was initially unknown to the fire department defendants and ended soon after they learned of it. There was accordingly no showing of intent, which would require that the fire department defendants either deliberately impaired plaintiff's use and enjoyment of its land or knew that their actions would, or were substantially certain to, cause that result (see Copart Indus. v Consolidated Edison Co. of N.Y., 41 NY2d 564, 571 [1977]; Christenson v Gutman, 249 AD2d 805, 807-808 [1998]). Plaintiff's nuisance claim would more properly be viewed as one based upon the purportedly negligent use of the deck gun, but "[a] nuisance, either public or private, based on negligence and whether characterized as either negligence or nuisance, is but a single wrong, and whenever a nuisance has its origin in negligence, negligence must be proven" (Copart Indus. v Consolidated Edison Co. of N.Y., 41 NY2d at 569 [internal quotation marks and citations omitted]; see Chenango, Inc. v County of Chenango, 256 AD2d 793, 794 [1998]). As noted above, the fire department defendants cannot be held liable for negligence and they cannot, by extension, be held liable for nuisance arising from the same conduct (see Murphy v Both, 84 AD3d 761, 763 [2011]; Hahn v City of Rensselaer, 166 AD2d 795, 796 [1990]).
As for plaintiff's trespass claim against the fire department defendants, firefighters "acting lawfully in the furtherance of their duty are excused from what may be otherwise trespassory acts" (Hand v Stray Haven Humane Socy. & S.P.C.A., Inc., 21 AD3d 626, 628 [2005]; see People v Czerminski, 94 AD2d 957, 957 [1983]; 2006 Ops Atty Gen No 2006-4). Although the use of the deck gun in a manner that caused water to fall upon plaintiff's property constituted a trespassory act (see e.g. Dellaportas v County of Putnam, 240 AD2d 358, 359 [1997]), that act was indisputably done in furtherance of the fire department defendants' firefighting duties. Plaintiff did not come forward with any proof to suggest [*4]that the fire department defendants' acts were unrelated to that purpose and, as such, summary judgment dismissing plaintiff's trespass claim was justified.
Finally, Supreme Court properly granted Bullrushes' motion for summary judgment dismissing the negligence claim against it. Bullrushes owed plaintiff, its neighbor, a "duty to exercise reasonable care in the maintenance of its property to prevent foreseeable injury" (Brown v Long Is. R.R. Co., 32 AD3d 813, 813 [2006]; see Amica Mut. Ins. Co. v Town of Vestal, 191 AD2d 916, 917 [1993]; Ivancic v Olmstead, 112 AD2d 508, 508-509 [1985], affd 66 NY2d 349 [1985]) and foreseeability, in the context of third-party criminality, "depends on the location, nature and extent of the previous criminal activities and their similarity, proximity or other relationship to the crime in question" (New York Cent. Mut. Fire Ins. Co. v City of Albany, 247 AD2d 815, 816 [1998]; see Maheshwari v City of New York, 2 NY3d 288, 294 [2004]; Jacqueline S. v City of New York, 81 NY2d 288, 294-295 [1993]; Haire v Bonelli, 107 AD3d 1204, 1205 [2013], lv denied 22 NY3d 852 [2013]). Bullrushes had reason to know that one or more trespassers had entered onto its property over the years, but there was no prior history or other reason to suspect that arson was a risk. It follows that "[t]he intervening criminal act of arson was not a natural, reasonable foreseeable consequence of" Bullrushes' allegedly lackluster efforts to secure its property (East Ramapo Cent. School Dist. v Orangetown-Monsey Hebrew School, 141 AD2d 693, 693 [1988]; see Marr v Seventh Day Adventist Church, 29 AD3d 959, 961 [2006], lv denied 7 NY3d 715 [2006]; compare Associated Mut. Ins. Coop. v 198, LLC, 78 AD3d 597, 597 [2010]; New York Cent. Mut. Fire Ins. Co. v City of Albany, 247 AD2d at 816-817). In any event, even if Bullrushes could have foreseen the possibility of arson, its failure to guard against that risk was not a substantial factor in causing water to seep into the powerhouse, as that seepage stemmed from the "independent" and "far removed" acts of the fire department defendants in choosing to operate the deck gun as they did (Derdiarian v Felix Contr. Corp., 51 NY2d 308, 315 [1980]; see Strnad v Garvin, 64 AD3d 1230, 1230 [2009], affd 13 NY3d 851 [2009]; Amica Mut. Ins. Co. v Town of Vestal, 191 AD2d at 917). Thus, Bullrushes was entitled to summary judgment.
Garry, P.J., Lynch, Clark and Reynolds Fitzgerald, JJ., concur.
ORDERED that the order is affirmed, without costs.



Footnotes

Footnote 1: The fire department defendants also sought summary judgment dismissing a related subrogation action, an aspect of their motions that was denied and is not at issue.

Footnote 2: We note that these principles are applicable regardless of whether fire protection is afforded by a municipal corporation or by a private not-for-profit corporation under the municipality's control (see Helman v County of Warren, 114 AD2d 573, 573-574 [1985]).

Footnote 3: Plaintiff's employee testified that he baled out the catch basin and that no more water seeped through the masonry joint after he complained about the problem. Subsequent water infiltration from the intake canal occurred because a power outage — resulting either from the initial water infiltration or the employee's actions in restarting the uninterrupted power supply after it had gotten wet — caused equipment to go out of alignment and damage a seal.