[960 NE2d 356, 936 NYS2d 587]

Carmen Valdez, Individually and as Mother and Natural Guardian of Ceasar Marti and Another, Infants, Appellant, v City of New York et al., Respondents.

Argued September 7, 2011; decided October 18, 2011

**POINTS OF COUNSEL**

*Sivin & Miller, LLP*, New York City (*Edward Sivin* of counsel), for appellant. I. *McLean v City of New York*, 12 NY3d 194 (2009) did not abrogate municipal liability in cases involving a special relationship created by a promise of police protection. (*Moch Co. v Rensselaer Water Co.*, 247 NY 160; *Glanzer v Shepard*, 233 NY 236; *Marks v Nambil Realty Co.*, 245 NY 256; *Pelaez v Seide*, 2 NY3d 186; *Cuffy v City of New York*, 69 NY2d 255; *Brawer v Carter*, 937 F Supp 1071.) II. The evidence that Officer Jose Torres told Carmen Valdez that Felix Perez would

be arrested "immediately" and directed Valdez to return to her house instead of fleeing with her children to her grandmother's home was sufficient to support the jury's conclusion that Valdez justifiably relied on Torres' promise of protection. (*Cohen v Hallmark Cards*, 45 NY2d 493; *Cuffy v City of New York*, 69 NY2d 255; *De Long v County of Erie*, 60 NY2d 296; *Florence v Goldberg*, 44 NY2d 189; *Mastroianni v County of Suffolk*, 91 NY2d 198; *Sorichetti v City of New York*, 65 NY2d 461; *Shinder v State of New York*, 62 NY2d 945; *Yearwood v Town of Brighton*, 64 NY2d 667.)

*Michael A. Cardozo, Corporation Counsel*, New York City (*Mordecai Newman* and *Larry A. Sonnenshein* of counsel), for respondents. I. In *McLean v City of New York* (12 NY3d [2009]), this Court held unequivocally that the special duty exception is not applicable where discretionary municipal conduct is challenged in a tort action. Prior case law establishes that police protection undertaken on behalf of individual citizens is discretionary. Accordingly, the special duty exception may not be employed to found civil liability arising from such an undertaking. (*Lauer v City of New York*, 95 NY2d 95; *Tango v Tulevech*, 61 NY2d 34; *Pelaez v Seide*, 2 NY3d 186; *Kovit v Estate of Hallums*, 4 NY3d 499; *Dinardo v City of New York*, 13 NY3d 872; *Cuffy v City of New York*, 69 NY2d 255; *Weiss v Fote*, 7 NY2d 579; *Hoffman v Board of Educ. of City of N.Y.*, 49 NY2d 121; *Donohue v Copiague Union Free School Dist.*, 47 NY2d 440; *Brown v City of New York*, 73 AD3d 1113.) II. Plaintiff testified explicitly that she expected a call from the police confirming that Felix Perez had been arrested, but she received no such call. Accordingly, she cannot show that her decision to leave the building was based on a justifiable expectation that Perez had been arrested when she left her home. (*Cuffy v City of New York*, 69 NY2d 255; *Lauer v City of New York*, 95 NY2d 95; *Merced v City of New York*, 75 NY2d 798; *Pelaez v Seide*, 2 NY3d 186; *Sorichetti v City of New York*, 65 NY2d 461; *Mastroianni v County of Suffolk*, 91 NY2d 198.)

*Fried, Frank, Harris, Shriver & Jacobson LLP*, New York City (*Janice MacAvoy, Margaret E. Hirce* and *Brenna C. Terry* of counsel), and *Sandra S. Park* for New York City Bar Association and others, amici curiae. I. New York State's comprehensive policy opposing domestic violence mandates the protection of its victims and assures victims that police will take action. (*Bruno v Codd*, 47 NY2d 582; *Sorichetti v City of New York*, 65 NY2d 461; *Cuffy v City of New York*, 69 NY2d 255.) II. The decision of

the Appellate Division jeopardizes victim safety and the efficacy of New York's domestic violence laws, and is inconsistent with international human rights law. (*Castle Rock v Gonzales*, 545 US 748; *Printz v United States*, 521 US 898; *Sosa v Alvarez-Machain*, 542 US 692; *The Paquete Habana*, 175 US 677; *People v Scutari*, 148 Misc 2d 440; *Wilson v Hacker*, 200 Misc 124; *Roper v Simmons*, 543 US 551; *Grutter v Bollinger*, 539 US 306; *Lawrence v Texas*, 539 US 558; *Atkins v Virginia*, 536 US 304.) III. A finding of municipal liability in this case is consistent with prior case law and New York State's strong interest in protecting domestic violence victims. (*McLean v City of New York*, 12 NY3d 194; *Cuffy v City of New York*, 69 NY2d 255; *Sorichetti v City of New York*, 65 NY2d 461; *Dinardo v City of New York*, 13 NY3d 872; *Mastroianni v County of Suffolk*, 91 NY2d 198; *Lauer v City of New York*, 95 NY2d 95; *Tango v Tulevech*, 61 NY2d 34; *Haddock v City of New York*, 75 NY2d 478.)

**OPINION OF THE COURT**

Graffeo, J.

After her estranged boyfriend shot her, causing serious injuries, plaintiff Carmen Valdez sued the City of New York for failing to provide her with adequate police protection to prevent the attack. The primary issue before us is whether there was sufficient evidence in the record to establish the existence of a special relationship between Valdez and the police. Because we conclude that there was not, we affirm the order of the Appellate Division, which reversed the judgment in plaintiffs' favor and dismissed the complaint.

## I.

In July 1996, after a prior order of protection expired, plaintiff Carmen Valdez obtained a second order of protection against her former boyfriend, Felix Perez, in Bronx Criminal Court. She delivered the order to the Domestic Violence Unit at her local police precinct and asked that it be served on Perez. At that time, Valdez met Officers Torres and Pereira—the two individuals assigned to the unit. Valdez later received a telephone call from Officer Pereira confirming that Perez had been served with the court order.

According to Valdez, about a week later, Perez telephoned her at around 5:00 P.M. on a Friday evening and threatened to kill her. Perez had made various threats in the past—threats that prompted Valdez to secure an order of protection—but Valdez

viewed this threat as an escalation of his hostility because he had not previously threatened to kill her. Valdez immediately left her apartment with her two young sons, planning to go to her grandmother's house in the Bronx. On the way to her car, however, she stopped at a pay phone and contacted the Domestic Violence Unit to alert the police to the latest threat by Perez. She contended that she spoke with Officer Torres, who told her that she should return to her apartment and that the police would arrest Perez "immediately."[1]

After speaking to Officer Torres, Valdez returned to her apartment with her children where she remained for the rest of the evening. She did not hear from the police that evening, nor did she contact the precinct to inquire whether Perez had been located or arrested. The night passed without incident. The following day—a Saturday—Valdez and the children remained in their apartment most of the day. At about 10:45 P.M. that evening, Valdez stepped out of the apartment and into the hallway of her building intending to take out the garbage when she was confronted by Perez brandishing a gun. He ushered her back into the apartment doorway and, tragically, shot her two or three times, injuring her face and arm. The two children witnessed the shooting but were not physically harmed. Perez then turned the gun on himself and committed suicide.

Valdez commenced this action against the City of New York claiming that, based on her telephone conversation with Officer Torres, the City had undertaken a "special relationship" with her that created a duty of care; that the City was negligent in failing to arrest Perez prior to the attack; and that its negligence was a proximate cause of the shooting. Valdez also brought claims on behalf of the children, contending that the "special relationship" extended to them and that they could recover damages for negligent infliction of emotional distress because they were in the zone of danger at the time of the attack.

---

**1.** At trial, the City of New York denied that the police received a telephone call from Valdez on the evening before the shooting. In particular, Officer Torres testified that he did not speak to Carmen Valdez that night, nor was her name recorded in the log in which calls made or received by members of the Domestic Violence Unit were documented on July 19, 1996. Thus, the City denied that any promise was made to Valdez or that the police suggested that she return to her apartment. However, since the jury reached a verdict in plaintiffs' favor, for purposes of this appeal we must view the facts in the light most favorable to them and therefore assume that the conversation occurred as recounted by Valdez.

After issue was joined, the parties engaged in discovery but the City did not file a pretrial motion to dismiss or seek summary judgment dismissing the complaint. Instead, in 2006, the case proceeded to a jury trial. At the commencement of the trial, the City moved to dismiss the complaint on the ground that plaintiff had failed to state claims upon which relief could be granted asserting, among other arguments, that Valdez's allegations failed to establish the existence of a "special relationship" giving rise to a duty of care because there was insufficient evidence to show that any reliance on the purported statements of Officer Torres was justifiable. The City renewed this argument at the close of plaintiffs' proof. Both of these motions were denied.

At trial, Valdez offered her account of the events preceding the shooting, while the City asserted that Valdez had not contacted the police the night before the shooting and, as such, that the police neither promised to arrest Perez nor directed Valdez to return to her apartment. Consistent with its assertion that it never received a complaint from Valdez on the night in question, the City did not offer any evidence of investigative or other police activities taken in response to the telephone call. The jury apparently credited plaintiffs' proof as it returned a verdict apportioning fault 50% to the City and 50% to Perez, awarding damages in the amount of $9.93 million. Beyond the finding of negligence, the jury also determined that the City had acted in reckless disregard of plaintiffs' safety. The City moved to set aside the verdict on a number of grounds, reiterating its contention that the evidence had been insufficient to support a finding of "special relationship." Supreme Court declined to disturb the verdict on liability but modified the damages award in a minor respect (the parties also stipulated to reduce the award for past medical expenses).

The City appealed to the Appellate Division, which reversed the judgment and vacated the verdict in a divided decision (74 AD3d 76 [2010]). Three justices concluded that plaintiff failed to establish a special relationship because the proof was inadequate to support a finding that Valdez's reliance on the officer's promise to arrest Perez was justifiable. The two dissenting justices reasoned that there was sufficient evidence of justifiable reliance and would have sustained the liability verdict, albeit modifying the judgment to vacate the reckless disregard finding. Given that this Court's decisions in *McLean v City of New York* (12 NY3d 194 [2009]) and *Dinardo v City of New York* (13

NY3d 872 [2009]) were issued while this case was pending on appeal to the Appellate Division, the plurality, concurring and dissenting opinions all discussed those two cases. In particular, having concluded that plaintiffs demonstrated the existence of a special relationship, the dissent further addressed whether the failure of the police to arrest Perez or take other action to prevent the attack constituted a ministerial or discretionary act. Characterizing that act as ministerial, the dissent would have permitted plaintiff to recover.

Plaintiff appealed to this Court as of right on the two-justice dissent.

## II.

We begin with the observation that it is undisputed that this case involves the provision of police protection, which is a classic governmental, rather than proprietary, function. That being so, the facts potentially implicate two separate but well-established grounds for a municipality to secure dismissal of a tort claim brought against it by a private citizen injured by a third party. The first relates to the fundamental obligation of a plaintiff pursuing a negligence cause of action to prove that the putative defendant owed a duty of care. Under the public duty rule, although a municipality owes a general duty to the public at large to furnish police protection, this does not create a duty of care running to a specific individual sufficient to support a negligence claim, unless the facts demonstrate that a special duty was created. This is an offshoot of the general proposition that "[t]o sustain liability against a municipality, the duty breached must be more than that owed the public generally" (*Lauer v City of New York*, 95 NY2d 95, 100 [2000]). We have deemed it necessary to restrict the scope of duty in this manner because the government is not an insurer against harm suffered by its citizenry at the hands of third parties. Thus, in order to pursue her negligence action against the City in this case, plaintiffs were required to allege a special duty—which they attempted to do by contending that the telephone conversation with Officer Torres created a special relationship.

The second principle relevant here relates not to an element of plaintiffs' negligence claim but to a defense that was potentially available to the City—the governmental function immunity defense. Although the State long ago waived sovereign immunity on behalf of itself and its municipal subdivisions, the common-law doctrine of governmental immunity continues to

shield public entities from liability for discretionary actions taken during the performance of governmental functions (*Matter of World Trade Ctr. Bombing Litig.*, 17 NY3d 428 [2011]; *Lauer*, 95 NY2d at 99; *Tango v Tulevech*, 61 NY2d 34, 40 [1983]).[2] This limitation on liability reflects separation of powers principles and is intended to ensure that public servants are free to exercise their decision-making authority without interference from the courts. It further

> "reflects a value judgment that—despite injury to a member of the public—the broader interest in having government officers and employees free to exercise judgment and discretion in their official functions, unhampered by fear of second-guessing and retaliatory lawsuits, outweighs the benefits to be had from imposing liability for that injury" (*Mon v City of New York*, 78 NY2d 309, 313 [1991] [citation omitted]).

As a result, "[a] public employee's discretionary acts—meaning conduct involving the exercise of reasoned judgment—may not result in the municipality's liability even when the conduct is negligent" (*Lauer*, 95 NY2d at 99).[3] In other words, even if a plaintiff establishes all elements of a negligence claim, a state or municipal defendant engaging in a governmental function can avoid liability if it timely raises the defense and proves that the alleged negligent act or omission involved the exercise of discretionary authority. It is also clear from our precedent that the governmental function immunity defense cannot attach unless the municipal defendant establishes that the discretion possessed by its employees was in fact exercised in relation to the conduct on which liability is predicated (*see Mon*, 78 NY2d at 313; *Haddock v City of New York*, 75 NY2d 478, 484 [1990]).

As we recently observed in *McLean v City of New York* (12 NY3d at 203), when both of these doctrines are asserted in a negligence case, the rule that emerges is that "[g]overnment action, if discretionary, may not be a basis for liability, while

---

**2.** There are many other types of immunity defenses that may be raised by governmental entities, including quasi-judicial immunity, legislative immunity and prosecutorial immunity. Here, we are concerned only with governmental function immunity.

**3.** "[D]iscretionary or quasi-judicial acts involve the exercise of reasoned judgment which could typically produce different acceptable results whereas a ministerial act envisions direct adherence to a governing rule or standard with a compulsory result" (*Tango*, 61 NY2d at 41).

ministerial actions may be, but only if they violate a special duty owed to the plaintiff, apart from any duty to the public in general" (*see also Dinardo*, 13 NY3d at 874). *McLean* did not announce a new rule—it merely distilled the analysis applied in prior cases such as *Lauer* (95 NY2d 95; *see also Garrett v Holiday Inns*, 58 NY2d 253 [1983]).

In Chief Judge Kaye's decision in *Lauer,* we expressly rejected the contention "that a ministerial breach by a governmental employee necessarily gives rise to municipal liability" (95 NY2d at 99). *Lauer* clarified that, even when municipal action is ministerial—thereby "remov[ing] the issue of governmental immunity from [the] case" (*id.* [citation omitted])—the plaintiff in a negligence action must nonetheless establish that the municipality owed a duty of care by demonstrating the existence of a special duty beyond the obligation owed the public at large. In fact, in *Lauer* it was undisputed that the municipal negligence in question—the medical examiner's failure to deliver a corrected autopsy report to law enforcement authorities— amounted to a ministerial act (*id.*). Yet the Court applied the special duty analysis to determine whether the municipality could be answerable in negligence, concluding that plaintiff's claim could not be sustained because the medical examiner owed no special duty of care.[4] It is clear from the analysis in *Lauer* that the special duty rule assists a plaintiff in establishing a duty of care and that it operates independently of the governmental function immunity defense, which precludes liability even when all elements of a negligence claim—including duty— have been proved. The special duty doctrine is therefore not an exception to governmental function immunity.

Despite the analysis presented in *Lauer,* there has been lingering confusion concerning the relationship between the special duty rule (establishing a tort duty of care) and the governmental

---

4.  Chief Judge Lippman suggests that the special duty rule has never been applied in a case involving ministerial action (Lippman dissent at 91). But *Lauer* was a ministerial action case, as was *Garrett* (58 NY2d at 263 [issuance of certificate of occupancy relating to property with blatant and dangerous code violations could not be viewed as a discretionary act]). Although the ministerial/discretionary act dichotomy is not discussed in the decision, *De Long v County of Erie* (60 NY2d 296 [1983]) also falls in this category, as we noted in *Lauer* (95 NY2d at 100 [*De Long* involved "liability for ministerial failure to process '911' call"]). In *De Long*, a municipality was held liable for failing to provide police protection after a 911 operator—who promised to send the police "right away"—erroneously recorded the caller's address and dispatched the police to the wrong location.

function immunity defense (affording a full defense for discretionary acts, even when all elements of the negligence claim have been established). Some of this is attributable to municipal defendants, who have often waived the immunity defense by failing to timely raise it—causing courts to adjudicate claims based exclusively on special duty analysis. In *McLean*, we recognized our own role in blurring the distinctions between the two theories, acknowledging the existence of potentially misleading dicta in some of our prior cases (12 NY3d at 203). For this reason, we have endeavored here to explain the rationale underlying each doctrine in the hope of bringing further clarity to this complex area of the law.

This Court is not, however, unanimous in this effort. It appears that Chief Judge Lippman views the special duty rule as an exception to the governmental function immunity defense, at least in some circumstances. We did not adopt this view in *Lauer*, *McLean* and *Dinardo*—and decline to do so today. Judge Jones concludes that the governmental function immunity defense should be inapplicable to police protection cases, reasoning that a plaintiff should be able to recover in that category of claims as long as a special duty is established. We reject this approach as well.[5]

The dissenters seem to be concerned that, if governmental function immunity is available in police protection cases, plaintiffs will never be able to recover in negligence. Plaintiffs have similarly opined that the application of the *McLean* syllogism in this category of negligence cases will preclude plaintiffs from holding municipalities liable—a fear that is predicated on the theory that police work invariably involves the exercise of discretion. We do not share this view because we do not accept the premise underlying it. We know of no decision of this Court holding that police action (or inaction, as it might be more accurately characterized in this case) is always deemed

---

5. Judge Jones does not explain why the police—who put themselves in harm's way and are often called upon to make snap judgments with life and death consequences—should be entitled to less protection from tort liability than other government employees, such as the medical examiner in *Lauer* or the social services worker in *McLean*. To be sure, assuming plaintiff has established the existence of a duty of care, the ministerial acts of a police officer can give rise to liability, just like those of any other public employee. But we cannot discern from our precedent any basis for holding governmental entities accountable for the discretionary acts of police officers when immunity would attach to the acts of other municipal workers that exercised comparable discretionary authority.

to be discretionary under the discretionary/ministerial duty analysis.[6]

In order to prevail on a governmental function immunity defense, a municipality must do much more than merely allege that its employee was engaged in activities involving the exercise of discretion.

"Whether an action of a governmental employee or official is cloaked with any governmental immunity requires an analysis of the functions and duties of the actor's particular position and whether they inherently entail the exercise of some discretion and judgment. If these functions and duties are essentially clerical or routine, no immunity will attach" (*Mon*, 78 NY2d at 313 [citations omitted]).

Beyond the role the individual employee plays in the organization, the availability of governmental function immunity also turns on "whether the conduct giving rise to the claim is related to an exercise of that discretion" (*id.*). The defense precludes liability for a "mere error of judgment" (*see Haddock*, 75 NY2d at 485) but this immunity is not available unless the municipality establishes that the action taken actually resulted

---

**6.** In fact, the suggestion that it is seems particularly inapt here where plaintiffs' proof suggested that the police took no steps to investigate an allegation that an order of protection had been violated and the City offered no contrary evidence indicating that the police actually exercised discretionary authority in their assessment or response to the complaint (instead, the City's theory was that plaintiff never called Officer Torres and therefore never reported the violation). Even before the Legislature enacted a statute imposing certain mandates on the police in relation to enforcement of orders of protection (*see* CPL 140.10), this Court had recognized that the police are "obligated to respond and investigate" in some manner when they are advised that such an order has been violated (*Sorichetti v City of New York*, 65 NY2d 461, 470 [1985]). Although Chief Judge Lippman appears to share plaintiffs' view that the application of governmental function immunity precludes recovery because police action will invariably be deemed discretionary (Lippman dissent at 92-93), he paradoxically cites statutory authority for the proposition that, once advised that an order of protection had been violated, the police "were . . . required to make an arrest" (Lippman dissent at 87). Needless to say, the obligations imposed on police to investigate or take other action upon receipt of such an allegation would be integral to determining the scope of a police officer's discretionary authority, which may well be circumscribed. Indeed, the two Appellate Division justices that reached the discretionary versus ministerial act issue in this case concluded that the failure of the police to respond could not be characterized as a discretionary act. Although we need not resolve that issue, the concerns expressed by plaintiffs and the dissenters about the impact of *McLean* in police protection cases appear unwarranted.

from discretionary decision-making—i.e., "the exercise of reasoned judgment which could typically produce different acceptable results" (*Tango*, 61 NY2d at 41). For example, in *Haddock*, this Court held that governmental function immunity was unavailable to a municipality that failed to establish that the asserted negligence—the retention of an employee—was the consequence of an actual decision or choice. Instead, the proof showed that the municipality had failed to adhere to its own personnel procedures and had not "made a judgment of any sort" upon learning that the employee had a criminal record and had lied about it (*Haddock*, 75 NY2d at 485). In some police protection cases, municipalities will be able to establish that discretionary authority was exercised and in others they will not—just as is true in other types of claims.

### III.

With these principles in mind, we turn to the special duty issue in this case in recognition of the fact that, if plaintiffs cannot overcome the threshold burden of demonstrating that defendant owed the requisite duty of care, there will be no occasion to address whether defendant can avoid liability by relying on the governmental function immunity defense.[7] Here, the City repeatedly asserted that plaintiffs failed to allege a prima facie case of negligence. It argued that, even assuming plaintiffs' allegations to be true, no special relationship had been created between plaintiffs and the police sufficient to overcome the public duty rule and supply the requisite special duty of care.

To establish a special relationship, plaintiffs were required to show that there was:

> "(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking" (*Cuffy v City of New York*, 69 NY2d 255, 260 [1987] [citations omitted]).

The City focused its argument on the fourth element of the

---

7. That was the situation in *McLean* and *Dinardo*—plaintiffs in those cases failed to establish that a special duty existed, thereby rendering any further discussion concerning the availability of the governmental immunity defense unnecessary.

test—the "justifiable reliance" requirement. We have previously emphasized the importance of this factor, describing it as "critical" because it "provides the essential causative link between the 'special duty' assumed by the municipality and the alleged injury" (*id.* at 261). Where timely contested by the defense, the issue of whether a plaintiff offered sufficient evidence to establish a special relationship is a question of law for the court to resolve (*id.* at 263 [finding "as a matter of law" that plaintiffs' injuries were not the result of justifiable reliance on assurances of police protection]).[8]

■ Assuming, as we must given the procedural posture of this case, that the telephone call between Valdez and Officer Torres occurred as Valdez described, the officer's statement did not create a special relationship. It was not reasonable for Valdez to conclude, based on nothing more than the officer's statement that the police were going to arrest Perez "immediately," that she could relax her vigilance indefinitely, a belief that apparently impelled her to exit her apartment some 28 hours later without further contact with the police. The record indicates that Perez threatened plaintiff over the telephone—there is no indication that plaintiff knew where he was calling from or that she conveyed any information relating to his whereabouts to the police.[9]

Thus, it would not have been reasonable for Valdez to have relied on the police promise to arrest Perez "immediately" in a literal sense since his location had to be discovered. In fact, the record shows that Valdez understood that the police would first

---

**8.** Although both dissents rely extensively on *Cuffy*, they also suggest that we are somehow exceeding our jurisdiction by assessing the sufficiency of plaintiffs' proof on the justifiable reliance element (*see* Lippman dissent at 88; Jones dissent at 95). In *Cuffy*, just as in this case, the claim proceeded to trial and a verdict was issued in plaintiffs' favor. We nonetheless reversed and dismissed the complaint based on our conclusion that the justifiable reliance element of the special relationship test had not been established as a matter of law. Here, the City moved to dismiss the complaint for failure to state a prima facie case and subsequently moved to set aside the verdict on the rationale that, even assuming the facts proffered by plaintiffs to be true, proof on the justifiable reliance element was lacking. This raised a question of law appropriate for review in this Court.

**9.** This would be a different case if the malefactor was in the presence of the police when a promise of immediate arrest was made. For example, if the police arrived at the scene of a domestic violence incident, removed the offender from the home and then announced an intention to make an immediate arrest, a victim hearing such a promise would have ample basis to rely on it. In that situation, unlike this one, the victim would have a reasonable basis to believe that the police were in a position to promptly fulfill the promise.

have to find Perez before he could be arrested since she testified at trial that she did not call Officer Torres when she returned to her apartment because she believed Torres would not be at the precinct but would be out looking for Perez. At best, since Valdez had no reason to believe that the police knew where Perez was, the officer's statement could reasonably be viewed only as a promise to look for Perez and arrest him if he was located. It was not reasonable for plaintiff to relax her vigilance based on this type of representation that was dependent on locating Perez.

Furthermore, Valdez's own statements concerning her expectations undercut the claim of justifiable reliance. Based on her prior experience with the Domestic Violence Unit, Valdez testified that she expected the police to call her back to confirm the arrest—and she acknowledged that she received no such call prior to the attack (nor did she contact the precinct to inquire concerning the status of the search). Because Valdez expected to receive confirmation that Perez had been taken into custody, it is difficult to reconcile her contention that she was nonetheless justified in relaxing her vigilance when more than a day passed with no word of the expected arrest. As is evident from the analysis in *Cuffy*, a promise by police that certain action will be forthcoming within a specified time period generally will not justify reliance long after a reasonable time period has passed without any indication that the action has occurred.

For all of these reasons, this case is distinguishable from *Mastroianni v County of Suffolk* (91 NY2d 198 [1997]), on which plaintiff relies. In *Mastroianni*, the police responded to a call at the victim's residence and found that her estranged husband, who had allegedly been inside her home, had taken refuge at the home of a neighbor. After speaking to both the victim and the husband, the police advised the victim that they would not make an arrest but assured her that they would do what they could for her if there were additional problems with her husband. The police then remained on the scene, across the street from the home—an action that permitted the victim to reasonably believe that the police were nearby and able to monitor the situation and that they would provide protection if the need arose that evening. The fact that the police did not leave the area and therefore remained in a position to lend additional assistance provided a basis, beyond the promise, for the victim to relax her vigilance and reasonably rely on their continued protection. When the police briefly left for a dinner break

without informing the victim, the husband entered her home and stabbed her to death.[10] In *Mastroianni*, the police had promised to assist the victim and then remained in the area, thereby initially making good on their promise and providing a basis for the victim to believe that they could—and would—provide police protection if needed. No comparable circumstances were present here.

Since there were no extraneous factors beyond Officer Torres' promise that can be said to have contributed to plaintiff's sense of security, plaintiffs' justifiable reliance argument is based on the contention that it was reasonable for Valdez to rely on Torres' statement that Perez would be arrested immediately simply because the officer said so. In other words, plaintiffs suggest that it is always justifiable for a citizen to rely on an assertion made by a police officer.[11] Were we to credit this argument, we would conflate two separate elements of the special relationship

---

**10.** Plaintiffs' reliance on *Sorichetti* (65 NY2d 461) is similarly misplaced. That case was decided before this Court had articulated the four-part special relationship test and it is not clear that the Court applied the "justifiable reliance" element as it is currently constituted (*see also De Long*, 60 NY2d 296 [in case where jury was never charged on reliance element and defendant failed to object, Court suggested in dicta that there was sufficient evidence of reliance]). Moreover, *Sorichetti*—which involved an assault by a father on his daughter during weekend visitation—is distinguishable on its facts. Due to the acrimonious relationship between the parties, the father had been ordered to pick up and drop off the child at the local police precinct. Given the father's history of abusive behavior and recent threats that he would harm the child, the mother waited at the precinct on a Sunday afternoon and, when the father did not return the child promptly at 6:00 P.M. as directed, she asked the police to go to the father's home and investigate. The police strung her along, repeatedly indicating that, if the father did not appear with the child, they would take action. Thus, instead of going to the father's home to look for her daughter, the mother remained at the police station. It was not until 7:00 P.M. that it became clear that the police did not, in fact, intend to lend any assistance; at that time, the mother's reliance on the police statements would no longer have been justifiable. But, by then, the harm had already occurred—at 6:55 P.M. the father's sister went to the father's home and discovered that, sometime between 6:00 P.M. and 6:55 P.M., he had severely injured the girl.

**11.** In his dissent, Chief Judge Lippman further suggests that it was reasonable for plaintiff to rely on the order of protection—and he asserts that our holding today suggests that such orders "may not be reasonably relied upon" (Lippman dissent at 88). But Valdez does not claim that she relaxed her vigilance in justifiable reliance on the order of protection—she contends that she relied on the promise that Perez would be arrested immediately. The order of protection was certainly significant in this case since it afforded the occasion for the promise of arrest given that Perez's threats amounted to a violation of the order (and its existence would be of even greater importance if we reached

test because proof that a promise was made would simultaneously fulfill both the "promise" and "justifiable reliance" elements of the four-part test. This we must decline to do. Although, in a colloquial sense, we should be able to depend on the police to do what they say they are going to do—and no doubt the police have an obligation to attempt to fulfill that trust—it does not follow that a plaintiff injured by a third party is always entitled to pursue a claim against a municipality in every situation where the police fall short of that aspiration. The element of justifiable reliance must be assessed through the prism of reasonableness and liability will not always extend to a municipality for injuries caused by the violent acts of a third party.

Because we have concluded that plaintiffs' proof was insufficient to establish a special relationship and demonstrate that the City owed them a special duty of care, we agree with the Appellate Division that Supreme Court should have dismissed the negligence claims for failure to establish a prima facie case. Having determined that the duty element was lacking, we have no occasion to address whether the City preserved its right to assert the governmental function immunity defense by raising it in the trial court and, if so, whether it could have avoided liability under such a defense on the rationale that the alleged negligence involved the exercise of discretionary authority.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

Chief Judge Lippman (dissenting). If, as the majority suggests, there is no basis for a governmental immunity defense in this case because the "City offered no . . . evidence indicating that the police actually exercised discretionary authority in their assessment or response to [plaintiff's] complaint" (majority op at 79 n 6), then it would seem to me that plaintiff must prevail. The majority identifies no legal principle that would justify setting aside the jury verdict in plaintiff's favor. It is said that there was no legally sufficient basis for the jury's conclusion that plaintiff justifiably relied upon the promise that her

the discretionary/ministerial act issue). Undoubtedly, orders of protection are important law enforcement tools. But such orders are not self-executing and must be enforced by individual police officers, a fact well known to Valdez. The issue in this case is whether Valdez reasonably relaxed her vigilance based on what was, in substance, a promise to look for Perez and arrest him if he were located—not whether orders of protection may reasonably be relied on in the abstract.

eventual assailant would be arrested "immediately." But the evidence, viewed in the light most favorable to the plaintiff (*see Szczerbiak v Pilat*, 90 NY2d 553, 556 [1997]), was at least adequate to permit the jury rationally to conclude that Ms. Valdez reasonably relied upon Officer Torres's assurances when she elected to return to her apartment on July 19, 1996 and when she opened her door to take out her garbage on the evening of the following day.

The evidence credited by the jury showed that on the evening of July 20, 1996, plaintiff Carmen Valdez sustained serious injuries when she was shot twice in the face and once in the arm by her estranged boyfriend, Felix Perez, who then turned his gun on himself with fatal consequence. The shooting of Ms. Valdez occurred at the threshold of her apartment and was witnessed by her two five-year-old children. During the weeks preceding the shooting, Perez had repeatedly abused, harassed and threatened Valdez and had been the subject of two orders of protection. The order in effect at the time of the shooting, issued on July 11, 1996, directed Perez to stay away from Valdez's home, school and place of employment, and forbade him from harassing, intimidating or threatening her.

Notwithstanding the pendency of this order, Perez, who retained a key to Valdez's apartment building, repeatedly confronted or attempted to confront her there. Accordingly, after receiving a telephone call from Perez on the evening of July 19, 1996, in which Perez threatened to kill her, Valdez fled her apartment with her children intent upon seeking refuge at the home of her grandmother. Before getting in her car to drive to her grandmother's, however, Valdez used a street pay phone to call Jose Torres, one of the Domestic Violence Unit police officers assigned to and familiar with her case and its history. According to Ms. Valdez's credited testimony, on hearing of Perez's threat and plaintiff's plan to flee her apartment, Torres instructed plaintiff not to go to her grandmother's, but to "immediately" return to her apartment. He assured her that Perez would be arrested "immediately." Valdez testified that Torres "told [her] don't worry, don't worry, we're going to arrest him. Go to your home and don't worry anymore." Valdez did as Torres said, abandoning her plan of sheltering herself and her children at her grandmother's. That evening and the ensuing night passed without incident and Valdez recalled that she felt her "nightmare was over." The reality was unfortunately very different. Torres evidently took no action in pursuance of his

representation that Perez would be immediately arrested and, Perez, left to his own devices, by the next evening found his way to the hallway outside Valdez's apartment. There, he waited, and when plaintiff emerged from the apartment to take out her garbage he forced her back into the apartment and shot her.

The Appellate Division reasoned that Ms. Valdez could not have justifiably relied upon Officer Torres's assurances because "there was no [confirmatory] visible police conduct or action of any type" (74 AD3d 76, 81 [1st Dept 2010]). We have, however, never made such confirmation a legally requisite condition of a special duty finding. It is true that in *Cuffy v City of New York* (69 NY2d 255 [1987]) we held that the plaintiffs there could not have reasonably relied upon police assurances that their downstairs tenant would be arrested when the promised time for that action had come and gone and plaintiffs were admittedly aware that the arrest had not been made (69 NY2d at 263). But all *Cuffy* establishes is that knowledge that the police have not acted in accordance with an assurance will defeat a claim of reasonable reliance on the assurance; it does not stand for the very different proposition formulated by the Appellate Division plurality that absent objective confirmation that the police have made good upon a promise of protection their promise may not be reasonably relied on. Here, Ms. Valdez, unlike the *Cuffy* plaintiffs, was not in a position visually to confirm whether the promised arrest had been made. She might, of course, have called Torres to find out if Perez had been taken into custody, but under the circumstances the jury properly concluded that this was not, as the City had contended, required to justify her reliance.

Ms. Valdez had a preexisting relationship with Officer Torres, who had been assigned to her case and, along with his partner, Officer Pereira, was aware of the orders of protection against Perez and the history of domestic violence that had led to their issue. Ms. Valdez had every reason to expect that Torres would, upon learning of Perez's death threat and her consequent plan to move to a safer place, act responsibly to see that the order of protection was enforced. In this context, Torres's assurance that Perez would be immediately arrested was one that Valdez should have been able to rely upon, particularly when it was coupled with the instruction that Valdez should dispense with her plan to relocate, as indeed the police themselves had previously urged her to do, and immediately return to her residence.

This was not a situation in which a police officer offhandedly promised to send a car within the hour or to keep an eye out and the promisee "colloquially" counted on the representation. Here, a specific promise was made within a relationship established for the purpose of protecting Ms. Valdez, and reliance upon that promise was contemporaneously actively encouraged by the promisor. I would have thought it absolutely clear that the jury could have reasonably concluded that Ms. Valdez justifiably relied upon Officer Torres and the Domestic Violence Unit expeditiously to arrest Perez, or, failing the attainment of that objective, to advise her that the promised action had not been taken and that Perez remained at large.

The majority, like the Appellate Division, extracts from *Cuffy* the general principle that reliance will not be deemed justified where official action is promised within a time and the time passes without confirmation that the promised act has been performed. Whatever the general applicability of this principle—which, as noted, is not fairly derived from the specific facts of *Cuffy*—it is here inapposite. Plaintiff had a valid order of protection against Perez and pursuant to CPL 140.10 (4) (b) (i)[1] the police were, upon her report of its violation, required to make an arrest. The reasonableness of her reliance upon the police to do what they were legally required to did not fade, like skywriting, simply by reason of the passage of time. Indeed, even if Ms. Valdez had not been justified in believing that Perez's arrest would be imminently accomplished, she was certainly justified in believing that the promise of an arrest required by law would eventually be kept. Certainly, the jury was not wrong to reject

---

1. The statute provides in relevant part:

"4. Notwithstanding any other provisions of this section, a police officer *shall* arrest a person, and shall not attempt to reconcile the parties or mediate, where such officer has reasonable cause to believe that: . . .

"(b) a duly served order of protection or special order of conditions issued pursuant to subparagraph (i) or (ii) of paragraph (o) of subdivision one of section 330.20 of this chapter is in effect, or an order of which the respondent or defendant has actual knowledge because he or she was present in court when such order was issued, where the order appears to have been issued by a court of competent jurisdiction of this or another state, territorial or tribal jurisdiction; and

"(i) Such order directs that the respondent or defendant stay away from persons on whose behalf the order of protection or special order of conditions has been issued and the respondent or defendant committed an act or acts in violation of such 'stay away' provision of such order" (emphasis added).

the theory that her expectation ceased to be reasonable after a day; it was at least as reasonable for the jury to conclude, as it evidently did, that with the passage of time an arrest became more, not less, likely, and that, particularly in the absence of any advisement to the contrary, plaintiff should have been able to count on the police to do what had been promised. The Court's conclusion to the contrary is puzzling, not only because the question of reliance in these circumstances is intensely fact-bound and as such not properly within our jurisdictional purview,[2] but also because it entails a finding that plaintiff could not have relied upon the police to do, not only what was specifically promised, but what was legally required.

To be clear, I do not say that, in every case where a governmental act is legally mandated, its performance, even when made the subject of a personal assurance, may be reasonably relied upon—there may well be situations in which specific objective circumstances known to the plaintiff would preclude such reliance—only that, where, as here, there are no circumstances manifestly preclusive of reliance, it does not seem possible to say as a matter of law that it is unreasonable to expect the government to act in accordance with its legal mandate. That, however, is what the Court holds today. This is from a legal perspective merely incorrect, but from an equitable and policy perspective devastatingly wrong. Orders of protection are intended to, and do, foster reliance. To now say that they may not be reasonably relied upon, even in a situation where the party who has been adjudicated in need of protection has been specifically promised that the order will be enforced and has no objective indication that her reliance was misplaced, fundamentally subverts the utility of these orders. While this undoubtedly shields government from liability, that objective cannot in all circumstances be the decisional imperative.

We have long recognized "the unfairness . . . in precluding recovery when a municipality's voluntary undertaking has lulled the injured party into a false sense of security and has thereby induced him either to relax his own vigilance or to forego other

---

**2.** The majority overreads this statement. I do not say that the issue of justifiable reliance may never be determined as a matter of law; plainly, as *Cuffy* shows, it may. It remains, however, that the question of whether there is a special duty, and the entailed inquiry as to whether there has been justifiable reliance, are generally factually laced and, as such, ordinarily unsuitable for disposition purely as matters of law (*see De Long v County of Erie*, 60 NY2d 296, 306 [1983]); this case is no exception.

available avenues of protection" (*Cuffy*, 69 NY2d at 261). In such situations we have employed the special duty doctrine to permit recovery, even where the underlying failure was in the discharge of a governmental function (*see id.*). The doctrine not only narrows the class of permissible plaintiffs—which is to say the scope of the duty assumed—to those specifically promised assistance, but provides a theory of liability that does not, in the main, rest upon negligence in the provision of governmental services. Substituted for that largely forbidden claim is a theory more akin to promissory estoppel: it would be inequitable to deny recovery where there has been detrimental reliance upon a definite promise of assistance given directly by an agent of the municipality to the plaintiff. Until *McLean v City of New York* (12 NY3d 194 [2009]), it had been understood that this theory, if proved, permitted recovery, regardless of whether the underlying negligence was in the performance of a discretionary governmental function (*see Cuffy*, 69 NY2d at 260); the theory, after all, did not impose liability for failing to provide a governmental service per se, but for falsely promising that such a service would be provided and thereby inducing detrimental reliance and otherwise avoidable harm, the risk of which was known to the promisor (*see id.*).

In *McLean*, however, the Court, in the course of addressing the plaintiff's contention that she was entitled to prevail even if she had not established the existence and breach of a special duty, since the sued upon negligence was assertedly in the performance of a ministerial function, undertook to address the distinction apparently drawn in our cases respecting the actionability of discretionary as opposed to ministerial government conduct. Quoting language from our decisions in *Pelaez v Seide* (2 NY3d 186 [2004]) and *Kovit v Estate of Hallums* (4 NY3d 499 [2005]) which seemed to cast the special duty doctrine simply as an exception to the rule of governmental immunity for discretionary acts, and contrasting that language with portions of our decisions in *Tango v Tulevech* (61 NY2d 34, 40 [1983]) and *Lauer v City of New York* (95 NY2d 95, 99 [2000]) describing the immunity for discretionary conduct as absolute, the *McLean* court said:

> "If there is an inconsistency, we resolve it now: *Tango* and *Lauer* are right, and any contrary inference that may be drawn from the quoted language in *Pelaez* and *Kovit* is wrong. Government action, if

discretionary, may not be a basis for liability, while ministerial actions may be, but only if they violate a special duty owed to the plaintiff, apart from any duty to the public in general" (12 NY3d at 203).

The question that has widely arisen since *McLean* is whether it abrogated the special duty doctrine—whether even though a plaintiff succeeded in demonstrating the existence and breach of a voluntarily assumed special duty, as well as resultant injury, recovery would still be barred because the action was ultimately "based" upon governmental conduct involving the exercise of discretion. While I expressed the view in *Dinardo v City of New York* (13 NY3d 872, 875-878 [2009, Lippman, Ch. J., concurring]) that *McLean* does indeed mean what it says—a circumstance other jurists have found "inconceivable" (*see Valdez v City of New York*, 74 AD3d 76, 78 [2010])—I at the same time expressed serious doubts as to the accuracy of *McLean*'s iteration of the law respecting the applicability of the special duty doctrine and misgivings as to what that iteration portended, specifically for claims involving failures to provide promised police protection (13 NY3d at 876-878).

If, as the majority suggests, there is no factual basis for defendants' resort to the broad immunity recognized in *McLean*, then, as noted, the amply supported jury verdict should be upheld. It appears, however, that this was a case litigated from the outset and ultimately put to the jury upon the theory that because the claim was based on a failure to provide police protection it would be barred unless plaintiff established the existence of a special duty voluntarily assumed by the City and its breach with consequent damages.[3] Although the majority posits that the action was dismissed because plaintiff did not establish the existence of a duty running specially to her, this is really only another way of saying that the action was dismissed because plaintiff did not meet a necessary condition of piercing the otherwise preclusive governmental immunity. But if the immunity is, as *McLean* indicates, impregnable where the government conduct sued upon involves the exercise of discretion, the City is correct in contending that the action should be dismissed

---

3. The jury was charged:
   "As a general rule, the police department is not responsible for injuries that result from a failure to provide police protection to a person. If, however, there is what is referred to as a special relationship between the police department and the injured party, the police department may be held responsible for the injuries."

on that ground, without treating with the issue of reasonable reliance, since the promised conduct, an arrest, while mandated by statute, necessarily entailed the exercise of professional judgment and discretion in the manner and timing of its execution. Thus, even though plaintiff should in fact have been able to rely on the promise made by Torres, and her reliance upon that promise, in effect to act in pursuance of the outstanding order of protection, was contemplated and, indeed, encouraged as a matter of legislative design, she would be barred from recovering because the promised undertaking involved some exercise of official discretion.

The special duty doctrine was conceived precisely to avoid such an inequitable and, frankly, regressive outcome. It was devised as an extremely narrow and difficult-to-establish exception to the rule of nonliability where discretionary government conduct was alleged to have resulted in injury; never, before *McLean*, was the doctrine applied with respect to claims based on non-discretionary, i.e., ministerial, governmental acts since that conduct had been understood to be categorically actionable, provided the ordinary conditions of tort liability were met (*see Signature Health Ctr., LLC v State of New York*, 28 Misc 3d 543 [Ct Cl 2010]).[4] *McLean*'s summary severance and reassignment of the doctrine to limit claims that would previously have been allowed, rather than permit otherwise barred causes as it had done in relation to claims based on discretionary acts, although presented as a mere clarification of existing law, in fact marked

---

4. Contrary to the majority (op at 77 n 4), *Lauer* and *Garrett v Holiday Inns* (58 NY2d 253 [1983]), carefully read, do not support the notion that, prior to *McLean*, a special duty claim was a requisite of recovery based on negligence in the performance of a ministerial act. While it is true that there always, consistent with basic principles of tort liability, had to be a sufficient relationship between the plaintiff and the municipality to support the imposition of a duty enforceable in tort, and in that respect such a relationship, as opposed to the municipality's relation to the public generally as a service provider, had to be "special" if a duty was to be found (*see Lauer*, 95 NY2d at 100-101), common-law tort principles, not involving the rigors of the special duty exception to the immunity for discretionary governmental acts, were ordinarily used to ascertain the existence of such a duty (*see Signature Health*, 28 Misc 3d at 553 n 7 [collecting cases]). While, obviously, a plaintiff could establish such a duty by demonstrating grounds for a promissory estoppel of the sort involved when establishing a special duty exception to the rule of immunity where discretionary governmental conduct was involved, and the plaintiff in *Lauer* relied, unsuccessfully, on such a theory among others (95 NY2d at 101-103), it is uncontrovertible that the exception's only necessary application and overwhelmingly dominant utility was in overcoming the immunity for discretionary governmental conduct.

a significant departure that has, as the array of opinions in this case at the Appellate Division demonstrates, left, even in its still temporally short wake, great confusion and uncertainty.

Today's decision, expressly leaving open the possibility that a special duty claim may be established and yet still be dismissed by reason of an ultimately unassailable immunity, effectively tolls the death knell for these actions. The doctrine was devised not simply to establish a duty owed to an individual rather than the public at large, but to permit recovery despite an otherwise preclusive immunity[5]—without accomplishing both purposes it would have been, and now is, as a practical matter futile, allowing recovery only in the inexplicable circumstance that the municipality neglects to interpose the immunity, or simply cannot do so because the conduct upon which the action is based is impossible to characterize as discretionary—a scenario of vanishingly small likelihood, particularly in police protection cases. Although the majority suggests that there remains a bright future for the theory in connection with claims based on ministerial duties, even if today's decision did not raise the reasonable reliance bar to a practically insurmountable height by holding, as a matter of law, that a plaintiff may not justifiably rely upon government to do both what it has specifically promised and what it must under the law—thus rendering what it characterizes as the distinct question of immunity avoidable in virtually all cases—no one should suppose that courts would

---

5.  In *Garrett* (58 NY2d at 261-262), for example, we said:

    "When a claim is made that a municipality has negligently exercised a governmental function, liability turns upon the existence of a special duty to the injured person, in contrast to a general duty owed to the public (*Florence v Goldberg*, 44 NY2d 189; *Sanchez v Village of Liberty*, 42 NY2d 876, app dsmd on other grounds 44 NY2d 817). Such a duty is found when a special relationship exists between the municipality and an individual or class of persons, warranting the imposition of a duty to use reasonable care for those persons' benefit (see *Sanchez v Village of Liberty, supra*). *This principle operates to impose liability* where the municipality has violated a duty commanded by a statute enacted for the special benefit of particular persons (see *Motyka v City of Amsterdam*, 15 NY2d 134); *where the municipality has voluntarily assumed a duty, the proper exercise of which was justifiably relied upon by persons benefited thereby* (*Florence v Goldberg, supra*; cf. *Schuster v City of New York*, 5 NY2d 75); or where it assumes positive direction and control under circumstances in which a known, blatant and dangerous safety violation exists (*Smullen v City of New York*, 28 NY2d 66)" (emphasis added).

construe governmental conduct to be ministerial with the liberality the majority now, in its dicta, seems to forecast.

I do not believe that a doctrine that has been so useful in tempering the harshness of governmental immunity in those rare and extreme cases where the government's *voluntary* promissory conduct has induced an individual's reliance and consequent harm should be dispatched, and certainly it should not be dispatched without explanation as if it had never existed. Today's decision, premised on a purely theoretical bifurcation of duty and immunity in the special duty context, merely completes the neutering first announced in *McLean*. I doubt that anyone will discern in it a plausible explanation as to why a doctrine that had for so long been considered to state grounds for overcoming the governmental immunity for discretionary acts, should have been summarily reduced to a vestige.

Accordingly, I would reverse the order of the Appellate Division, reinstate the verdict, and remit for further proceedings.

JONES, J. (dissenting). It is undisputed that "[m]unicipalities long ago surrendered common-law tort immunity for the negligence of their employees," save for discretionary acts (*Lauer v City of New York*, 95 NY2d 95, 99 [2000]; *see Tango v Tulevech*, 61 NY2d 34, 40 [1983]). Plainly stated, discretionary acts "may not result in the municipality's liability even when the conduct is negligent," and "[m]inisterial negligence may not be immunized" (*Lauer*, 95 NY2d at 99). However, concurrent with the Court's application of the governmental immunity defense to discretionary acts and its recognition of tortious ministerial acts, this Court declared the "narrow right to recover from a municipality for its negligent failure to provide police protection where a promise of protection was made to a particular citizen and, as a consequence, a 'special duty' to that citizen arose" (*Cuffy v City of New York*, 69 NY2d 255, 258 [1987]). This exception is consistent with the well-settled principle that there can be no liability against a municipality for negligence without the plaintiff demonstrating that a *specific duty* was owed to that person (*see Lauer*, 95 NY2d at 100).

Therefore, in my view, *Cuffy*'s "narrow right to recover from a municipality" remained unaffected by the Court's continued application of immunity to discretionary acts in claims by "a member of the public . . . against a municipality for its employee's negligence" (*Lauer*, 95 NY2d at 97; *see Dinardo v City of New York*, 13 NY3d 872 [2009]; *McLean v City of New*

*York*, 12 NY3d 194 [2009]). This view is supported by a long line of decisions concerning the narrowly-recognized claim against a municipality "for its negligent failure to provide police protection where a promise of protection was made to a particular citizen" (*Cuffy*, 69 NY2d at 258; *see De Long v County of Erie*, 60 NY2d 296 [1983]; *Schuster v City of New York*, 5 NY2d 75 [1958]) and common-law tort claims against a municipality where discretionary and ministerial distinctions are necessary to distinguish between actions by employees for which a municipality should and should not be held liable (*see McLean*, 12 NY3d at 202; *Lauer*, 95 NY2d at 99-100; *Tango v Tulevech*, 61 NY2d 34, 40 [1983]).* Thus, I would have concluded that a claim for the negligent failure to provide police protection is excepted from the governmental immunity defense and any discretionary or ministerial distinctions and proceeded to whether plaintiffs established prima facie evidence to support this claim.

> "[A]t the heart of most of these 'special duty' cases is the unfairness that the courts have perceived in precluding recovery when a municipality's voluntary undertaking has lulled the injured party into a false sense of security and has thereby induced him either to relax vigilance or to forego other available avenues of protection" (*Cuffy*, 69 NY2d 261).

To that end, a "special relationship" is established between a municipality and plaintiff when there is

> "(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on

---

* In *Lauer* and *McLean*, the plaintiffs asserted the existence of a "special relationship" as enumerated in *Cuffy* (a police protection case) to impose liability against a municipality. In each case, the Court rejected that assertion, holding that the plaintiff failed to demonstrate certain elements of that claim. Notwithstanding plaintiff's failure to satisfy the elements of a "special duty," we were undoubtedly constrained by *Tango* and its progeny to apply the ministerial and discretionary distinctions in those cases. The majority, in comparing the distinctions between police inaction cases and other tort cases against the municipality, aptly notes that the Court, in *Cuffy* and its predecessors, exposed municipalities to tort liability based upon the inaction of the police only where a "special duty" existed, but did not impose similar exposure based upon the inaction of other public employees because of the discretionary act exception to tort liability against a municipality. *Cuffy* explains indeed that a claim against a municipality for police inaction "where a promise of protection was made" is a "narrow class of cases," and the Court recognized such cases in *Cuffy* without regard to discretionary and ministerial distinctions (*see* 69 NY2d at 258, 260). Accordingly, I see no reason to apply such distinctions now.

behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking" (*id.* at 260).

This Court has made clear that it is "the injured party's reliance," as well as "the municipality's voluntary affirmative undertaking of a duty to act," that are "critical in establishing the existence of a 'special relationship' " (*id.* at 261).

Whether a special relationship existed is a question for the jury (*see generally De Long v County of Erie*, 60 NY2d at 306). Most significantly in this case, the jury had resolved the following in the affirmative: that plaintiff called her local police precinct and informed an officer that Perez had threatened to kill her; that the officer instructed her to stay home and that Perez would be arrested; that she justifiably relied on the police when she stayed at home with her children; and that the police's negligent inaction led to her harm. In other words, the jury specifically found a special relationship existed between plaintiff and the police department, and there was no basis upon which a court should have disturbed this jury verdict.

As in *Cuffy*, justifiable reliance is the issue upon which the majority relies to bar plaintiffs' recovery. In that case, the plaintiffs sought police protection from the tenants located on the ground-floor apartment of their two-family home. Mr. Cuffy advised a lieutenant at a local precinct that he would move his family immediately from the two-family home if an arrest of his tenant was not made. The lieutenant informed Mr. Cuffy that an arrest would be made or something else would be done "first thing in the morning" (69 NY2d at 259). On the following evening, Mrs. Cuffy and her two sons sustained severe injuries from an attack by the tenants at the home. The Court concluded that, although "the police [may have] had a 'special duty' to [the plaintiffs] because of the promise . . . made [to] those plaintiffs' overnight," the plaintiffs' justifiable reliance had dissipated by midday because the Cuffys, who remained home at the direction of the police, were "aware that the police had not arrested or otherwise restrained [the tenants] as had been promised" (*id.* at 263, 264).

Here, plaintiff provided her local police precinct with an order of protection so that it could be served on Perez. Two officers

from the Domestic Violence Unit were assigned to her case. Plaintiff alleged, and the jury believed, that after receiving a threatening phone call by Perez, she called the Domestic Violence Unit and spoke with one of the two officers assigned. She advised the officer that she was planning to go to her grandmother's house with her children, but was advised by him to return to her apartment and Perez would be arrested "immediately." The following evening, plaintiff was shot by Perez in the hallway of her apartment building. These facts do not support the conclusion that plaintiff's claim was insufficient as a matter of law.

I disagree with the majority's assessment that (1) plaintiff could not have justifiably relied upon the police's assurance that Perez would be arrested "immediately" because "his location had to be discovered" and (2) her "own statements concerning her expectations undercut the claim of justifiable reliance" because she expected a call from the police confirming the arrest (majority op at 82). To my mind, the word "immediately" implies that the police will act with urgency and the failure to receive a phone call from the police within 24 hours of her complaint does not demonstrate that plaintiff knew or should have known that the police did not act. Plaintiff secured an order of protection against Perez, had the order served by the police, and contacted the same unit to enforce the order. Based on the time that had passed (enough for the police to act, but insufficient for plaintiff to suspect inaction) and the officer's familiarity with her case, it is reasonable to conclude that plaintiff was justifiably lulled, by the police officer's promise, into a state of relaxed vigilance. Moreover, there is truly nothing noteworthy that indicates her reliance upon the police, who were assigned to her case and served the order of protection, was unjustified or, if justified, that it had dissipated (cf. Cuffy, 69 NY2d at 264). Thus, it cannot be said, as a matter of law, that plaintiff's reliance upon the promises of the police was unjustifiable. In fact, to conclude that this case involves unjustifiable reliance may be to remove claims based upon a "special duty" from possibility.

Accordingly, I too would reverse the Appellate Division order and reinstate the verdict.

Judges CIPARICK, READ, SMITH and PIGOTT concur with Judge GRAFFEO; Chief Judge LIPPMAN dissents and votes to reverse in

a separate opinion; Judge JONES dissents and votes to reverse in another opinion.

Order affirmed, with costs.