■ JANDY COLESON, Appellant, v CITY OF NEW YORK et al., Respondents. [964 NYS2d 419]—

Order, Supreme Court, Bronx County (Larry S. Schachner, J.), entered on or about March 12, 2012, which granted defendants' motion for summary judgment dismissing the complaint, affirmed, without costs.

Defendants' motion for summary judgment dismissing the complaint was properly granted. In the absence of any evidence that defendants assumed an affirmative duty to protect plaintiff from attacks by her husband, defendants do not owe a duty of care to plaintiff (*see Valdez v City of New York*, 18 NY3d 69 [2011]). The statements allegedly made by police officers and other employees of defendants—that plaintiff's husband would spend time in jail, and that the police would provide "protec-

tion" of an unspecified nature—were too vague to constitute promises giving rise to a duty of care (*see Dinardo v City of New York*, 13 NY3d 872, 874 [2009]). The lack of any such duty also warranted the dismissal of the infant plaintiff's claim for negligent infliction of emotional distress (*see Sheila C. v Povich*, 11 AD3d 120, 130 [1st Dept 2004]).

Given the absence of a duty owed to plaintiff, we need not consider whether defendants established their entitlement to the governmental function immunity defense (*see Valdez*, 18 NY3d at 80). Concur—Mazzarelli, J.P., DeGrasse and Feinman, JJ.

Moskowitz and Clark, JJ., concur in a separate memorandum by Moskowitz, J., as follows: I concur with the majority that *Valdez v City of New York* (18 NY3d 69 [2011]) mandates dismissal of plaintiffs' complaint, and that the IAS court properly granted the City's motion for summary judgment on that basis. However, while *Valdez* constrains me to cast my vote with the majority, I write separately to express concern at the current posture of the law regarding special duties of care by government entities.

Neither party disputes the facts of this case. Plaintiff Jandy Coleson married Samuel Coleson in October 1997; Rolfy, her son from a prior relationship, was Coleson's stepson. Beginning around 2001, Coleson subjected plaintiff to verbal and physical abuse, and in September 2001, during an argument, Coleson forcibly inserted a cordless telephone into plaintiff's vagina. After that incident, Coleson was incarcerated for around a month and plaintiff obtained an order of protection against him. Even with the order of protection in place, however, plaintiff continued to let Coleson live in the apartment after he was released because, plaintiff stated, his name was on the lease and he paid the rent. The order of protection expired after three months. Plaintiff obtained a second order of protection in late 2002; that order lasted only one month. In May 2004, plaintiff told Coleson that he had to leave the apartment because of his abusive behavior toward her and because of his drug and alcohol use.

On June 23, 2004, plaintiff called police to the apartment when Coleson returned and tried to stab her with an ice pick. Coleson left the building before police could apprehend him, but later that day, police returned to plaintiff's home and told her they had arrested Coleson. When police took plaintiff to the precinct, she spoke with a police officer who told her that Coleson was "going to be in prison for a while." The officer also told plaintiff "not to worry" since "they were going to give

[her] protection." Plaintiff testified that she did not ask for specifics, as she was too nervous. Later that evening, an officer called from the precinct and told her that Coleson was in the Bronx County Courthouse "in front of the judge" and that "[t]hey were going to sentence him." The officer said that she was going to "keep in contact" with plaintiff, and that "everything was in its process." Nevertheless, it later transpired that on June 24, 2004 the criminal court released Coleson on his own recognizance after arraignment.

On June 25, 2004, when plaintiff went to pick up Rolfy from school, Coleson accosted her and stabbed her in the back with a knife. Rolfy, who was then around seven years old, testified that he saw Coleson chasing plaintiff with a knife while she screamed for help. However, as Rolfy hid behind a car, a man who worked at a nearby car wash grabbed Rolfy and locked him inside a broom closet to protect him. While he was in the closet, Rolfy could hear sirens and screaming outside, and recalled "holding [himself] and saying 'Mommy, Mommy.' " He later testified that he saw "a lot of blood" as his mother lay on the ground, but did not see Coleson stab her.

Relying on *Valdez* and on *Dinardo v City of New York* (13 NY3d 872, 874-875 [2009]), this court now finds that these facts create no special duty toward plaintiff or her son. In his dissent in *Valdez*, Chief Judge Lippman noted that the majority's opinion in that case would likely lead to a legal scheme under which no municipal defendant would ever be found to have made promises giving rise to a duty of care toward an injured plaintiff (*id.* at 92). This case strongly suggests that Chief Judge Lippman's prediction has, in fact, come to pass.

It is true, as the City notes, that police did make some vague statements to plaintiff—for example, that police would give plaintiff unspecified "protection" and that she should not worry. I agree with the majority that under *Valdez*, these statements are, and should be, insufficient to create a special duty of care toward plaintiff.

But police also made concrete statements that, before the line of cases leading to *Valdez*, might well have been found to form a reasonable basis for plaintiff to believe that she would be safe from any further attack (*see e.g. Sorichetti v City of New York*, 65 NY2d 461, 469 [1985] [order of protection, combined with police knowledge of violence, instruction to victim, and reasonable expectation that police would protect her, were sufficient to find special relationship]). Indeed, a police officer not only allegedly told plaintiff that Coleson would be incarcerated "for a

while," but also told her that Coleson was "in front of the judge" and "in [the] process" of being sentenced.*

These alleged statements purported to inform plaintiff, apparently unequivocally, that her husband was in police custody and would remain there. While it would not have been reasonable for plaintiff to believe that Coleson would be incarcerated indefinitely, it was certainly reasonable for her to believe that he would be there at least for a day or two, especially in light of police statements that he would be incarcerated "for a while" (*see e.g. Mastroianni v County of Suffolk*, 91 NY2d 198 [1997] [special duty existed where police remained on scene for an hour after decedent's husband violated an order of protection; police left to take meal break without decedent's knowledge, at which time husband returned to the house and stabbed decedent]).

If the City's statements in this case are not specific enough to find that defendants assumed an affirmative duty to protect plaintiff, it is difficult to imagine any statements that could ever be specific enough. On the contrary, under the majority's ruling—which, to be clear, I concede is mandated under *Valdez*—it seems likely that no court of this State will ever find a municipality to have a special duty toward a plaintiff unless the municipality affirmatively consents to assume such a duty.

Thus, I fear that in the post-*Valdez* system, the police are now permitted to lull a domestic violence complainant into a false sense of security and then, when tragic results befall the complainant, disavow responsibility for having done so. The complainant is therefore left without any remedy, even where she was found to be entitled to protection by way of a restraining order and even where she has acted in reliance on police assurances. Further, the law after *Valdez* suggests to domestic violence victims that they cannot rely on police statements regarding their safety, should not follow police instructions, and have no reason to place trust in the police. This legal framework will redound to no one's benefit—not the police and certainly not the citizens the police are sworn to protect.

---

* Whether this scenario sounds plausible is beside the point. Plaintiff believed the officer's statements, and whether the officer actually made those statements implicates a matter of credibility not appropriate for resolution on summary judgment.